*This opinion is subject to revision before final publication in the Pacific Reporter*

**2020 UT 53**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

In the Matter of the Adoption of B.B.,
a person under eighteen years of age

R.K.B. and K.A.B.,
*Appellants,*
*v.*
E.J.T.,
*Appellee.*

No. 20180612
Heard on June 19, 2019
Supplemental Briefing Submitted on July 9, 2019
Filed on July 28, 2020

On Direct Appeal

Third District, Salt Lake
The Honorable Keith A. Kelly
No. 142900417

Attorneys:

Larry S. Jenkins, Lance D. Rich, David A. Jaffa, Salt Lake City,
for appellants

Angilee K. Dakic, Salt Lake City, for appellee

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court,
in which CHIEF JUSTICE DURRANT and JUSTICE PETERSEN joined.

JUSTICE HIMONAS filed a dissenting opinion, in which
JUSTICE PEARCE joined.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1    This is an adoption proceeding involving a child (B.B.) whose unmarried biological parents are members of the Cheyenne River Sioux Tribe. The child was born in Utah and placed for adoption in a proceeding filed in the third district court in 2014. We are hearing the case for the second time on appeal. In the first appeal, a majority of this court reversed on the basis of a

determination that the child's biological father (E.T.) had a right to intervene as a "parent" under a newly established federal standard of parentage under the Indian Child Welfare Act (ICWA).[1] On remand, both E.T. and the Cheyenne River Sioux Tribe moved to transfer the case to the tribal court under section 1911(a) of ICWA, which provides that an "Indian tribe" has exclusive jurisdiction "over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law." 25 U.S.C. § 1911(a). The district court granted the motion on the ground that B.B. was "domiciled within the reservation" at the time this action was filed. We reverse.

¶2 The district court based its decision on two alternative grounds: (1) the child was domiciled on the reservation because his mother (C.C.) was domiciled on the reservation at the time of the child's birth, and (2) the child was domiciled on the reservation because C.C. had "abandoned" him and transferred his domicile to that of E.T., who was domiciled on the reservation. We disagree on both counts. We hold that (1) C.C. was domiciled in Utah at the time of B.B.'s birth and (2) her initiation of formal adoption proceedings did not constitute an abandonment that shifted B.B.'s domicile to the reservation. We thus establish that the district court has jurisdiction, and reverse and remand for further proceedings.

## I. BACKGROUND

¶3 In December 2013, C.C. and E.T. were in a committed relationship and engaged in sexual intercourse that led to the conception of B.B. Both parents are members of the Cheyenne River Sioux Tribe, and both resided on the Cheyenne River Sioux Reservation in South Dakota at the time of conception and for the first six months of the pregnancy.

¶4 While on the reservation, C.C. decided to place B.B. for adoption.[2] With that in mind, she contacted Heart to Heart, a Utah

---

[1] See In re Adoption of B.B., 2017 UT 59, ¶ 71, 417 P.3d 1. But see id. ¶¶ 158–67 (Lee, A.C.J., joined by Durrant, C.J., dissenting) (concluding that ICWA incorporates state law standards of parentage and that the biological father in this case had failed to perfect his parental rights under state law).

[2] Appellants dispute whether C.C. had "decided unequivocally on adoption," citing C.C.'s deposition—including portions not in

(continued . . .)

adoption agency. Around June 2014, C.C. moved to Utah to be closer to friends and family and to pursue housing and employment opportunities. The stated plan was for E.T. to follow C.C. to Utah. But after the move, C.C. stopped communicating directly with E.T. and told him through family members that she planned to return to the reservation "soon."

¶5    C.C. gave birth to B.B. in Utah on August 29, 2014. The next day, she signed a relinquishment of parental rights and consent to adoption and gave physical custody of B.B. to Heart to Heart. C.C. did not immediately inform E.T. of B.B.'s birth. Instead, she signed a false statement naming her brother-in-law as B.B.'s biological father. Heart to Heart then had C.C.'s brother-in-law sign a contemporaneous relinquishment of parental rights and consent to adoption in which he falsely represented that he was B.B.'s biological father and neither an enrolled member of a Native American tribe nor eligible for membership in one.

¶6    On September 4, 2014, the prospective adoptive parents filed their adoption petition in the district court. Four days later, C.C. went to court and executed a voluntary relinquishment of parental rights, a consent to adoption, and a consent to an order terminating her parental rights, again naming her brother-in-law as B.B.'s biological father. On September 25, 2014, the district court issued an order purporting to terminate C.C.'s rights and determine the biological father's rights. The court then transferred legal custody of B.B. to Heart to Heart and authorized it to delegate custody to the prospective adoptive parents.

¶7    That same month, C.C. returned to South Dakota and told E.T. that she had given birth to B.B. and placed him for adoption. Three months later, E.T. moved to intervene in the adoption proceedings. The district court denied the motion. On appeal, this court held that E.T. was a parent under a newly established federal ICWA standard of parentage with a right to intervene in the adoption proceedings. *See In re Adoption of B.B.*, 2017 UT 59, ¶ 78, 417 P.3d 1. We reversed and remanded the case to the district court on that basis. *Id.* ¶ 3.

¶8    On remand, E.T. and the Cheyenne River Sioux Tribe asked the district court to transfer the adoption proceedings to the tribal court under 25 U.S.C. section 1911. The district court granted

_____

the record. The extra-record citations were improper, but do not affect our analysis because we conclude that the initiation of adoption proceedings does not constitute abandonment.

the motion to transfer under section 1911(a), which provides that an "Indian tribe" has exclusive jurisdiction "over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law." 25 U.S.C. § 1911(a). The district court based its decision on two alternative grounds. First, it held that B.B. was domiciled on the reservation at the time of his birth because his mother, C.C., was domiciled there at that time. Second, the court found that under the abandonment standard found in comment *e* of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 22 (AM. LAW INST. 1971), C.C. had "abandoned" the child by initiating adoption proceedings after the child's birth. The district court further interpreted this to mean that B.B. took on the domicile of his father, E.T., which was the reservation. Because the court deemed B.B. to be domiciled on the reservation at the time of the filing of the adoption petition on either or both of these grounds, it ordered the transfer of this case to the tribal court under 25 U.S.C. section 1911(a). The prospective adoptive parents then filed this appeal.

¶9    After oral argument, we issued a supplemental briefing order asking the parties to further address the controlling standard of "abandonment" in a case like this one. Specifically, we asked the parties to address whether abandonment is a federal or state standard in a case arising under 25 U.S.C. section 1911(a), and what the standard should be if the standard is federal.

## II. DISCUSSION

¶10 The jurisdictional question presented is controlled by section 1911(a) of ICWA. That provision states that tribal courts have "jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation" of an Indian tribe. 25 U.S.C. § 1911(a). The key question here is whether B.B. was "domiciled" on the reservation at the time the adoption proceeding was filed. If so, then the tribal court has exclusive jurisdiction and the case should be dismissed on jurisdictional grounds. Otherwise, the child was domiciled in Utah, the district court retained jurisdiction, and the case should proceed to judgment here.

¶11   A child born out of wedlock typically takes on the domicile of the birth mother. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 22 cmt. c (AM. LAW INST. 1971) (hereinafter RESTATEMENT). That general rule holds unless and until the mother "abandons" the child or takes other action. If and when there is an abandonment,

the child takes on the domicile of the person who then acquires the parental rights and obligations associated with the child. *See id.* § 22 cmt. e.

¶12 This background implicates the two questions answered by the district court here—whether the mother, C.C., was domiciled on the reservation at the time of the child's birth, and whether she "abandoned" the child and thereby transferred parental rights and obligations to the father, E.T., who is domiciled on the reservation. We disagree with the district court's determinations on both grounds.

¶13 Applying the uniform federal standard of domicile set forth in *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30 (1989), we hold that C.C. was domiciled in Utah in light of uncontradicted evidence in the record of her intent to remain permanently in Utah when she moved here. As to abandonment, we hold that even if ICWA does mandate a uniform federal standard of abandonment and that standard is found in the Restatement, there is no basis for a determination that C.C. abandoned her child and transferred parental rights and obligations—and domicile—to E.T.

A. C.C.'s Domicile

¶14 The United States Supreme Court established a uniform federal standard of "domicile" for ICWA proceedings in *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30 (1989). Citing the Restatement, treatises, and "established common-law principles," the court endorsed "generally uncontroverted" principles of domicile under which an adult's "domicile is established by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there." *Id.* at 47–48. "'Domicile' is not necessarily synonymous with 'residence,'" as "one can reside in one place but be domiciled in another." *Id.* at 48 (citations omitted). The key is the person's state of mind—her "intent to remain there" on a relatively permanent basis. *Id.* "One acquires a 'domicile of origin' at birth, and that domicile continues until a new one (a 'domicile of choice') is acquired" by moving to a new place with an intent to remain there relatively permanently. *Id.* Such intent may be established directly by express statements of

intention,[3] or indirectly by circumstantial evidence (such as a decision to move to find new employment).[4]

¶15 C.C. was concededly domiciled on the reservation at the time she became pregnant with her child. Her stay in Utah was also brief—just a few months. And soon after giving birth and placing her child for adoption, there is no question that C.C. decided to return to live on the reservation. These seem to have been the grounds for the district court's determination that C.C. remained domiciled on the reservation throughout her stay in Utah. The court found that C.C.'s intent was "to return to the Cheyenne River Sioux Reservation shortly after she relinquished her child." In so stating, however, the court never identified any evidence suggesting that C.C. had that intent at the crucial time of relevance to domicile—when she initially left the reservation and moved to Utah. Instead it just pointed to the short duration of her stay in Utah, noting that she "reside[d] in Utah for only three or four months before returning to reside on the Reservation." And in concluding that C.C. "lack[ed] credibility" in her relinquishment-form statement that she was not domiciled on the reservation, the court again highlighted the brevity of her stay and cited other events that happened after the move, such as C.C.'s return to the reservation within a month of giving birth to B.B. and misrepresentations about who B.B.'s biological father was. The district court also found that she probably did not understand "the

_____

[3] *See* Restatement (Second) of Conflict of Laws Ch. 2 Topic 2 Special Note (Am Law Inst. 1971) (hereinafter Restatement) ("A person's declarations as to what he considers to be his home, residence or domicil are generally admissible as evidence of his attitude of mind. Such declarations are frequently contained in formal legal documents, as wills, deeds and affidavits; they may also appear in letters, in hotel and automobile registrations and, at times, are made by word of mouth.").

[4] *See id.* ("In the absence of evidence as to the place where a person lives, . . . he will probably be found to be domiciled in the place where he works unless it can be shown that his job is only of a temporary nature. . . . Beyond all this, the place to which a person has the closest and most settled relationship is likely to be that where he votes, where he belongs to a church, where he pursues his various interests and where he pays taxes of the sort that are payable only by persons who are domiciled there. The courts frequently rely heavily upon such activities.").

meaning of domicile" when she asserted in her affidavit that she was not domiciled on an Indian reservation.

¶16 A fact-intensive determination of a person's domicile would ordinarily be a matter worthy of some deference on appeal.[5] But we defer to fact-intensive mixed determinations only where the district court applies the correct legal standard.[6] And here it appears that the district court applied a mistaken understanding of the standard of domicile. Nowhere in the written ruling did the district court ever identify the relevant time for evaluating C.C.'s intent in moving to Utah. In relying so heavily on the short duration of her stay in Utah, moreover, it appears that the court was focused on the wrong timeframe when it found that C.C. intended to return to the reservation. The court seems to have determined only that C.C. decided to move back to the reservation after placing her child for adoption and that her stay here was short. That is insufficient, as a person can establish a new domicile by moving somewhere with an intent to remain quite permanently but change her mind soon after arriving. *See Gardner v. Gardner*, 222 P.2d 1055, 1057 (Utah 1950) ("Short absence from a former abode may be sufficient to evidence abandonment thereof, although the party might soon change his intention. A floating intention to return to a former abode is not sufficient to prevent the new abode from becoming one's domicile.")

¶17 For the above reasons, we are not in a position to defer to the district court's determination of C.C.'s domicile. And we conclude that all the evidence in the record indicates that she had the intention of remaining here permanently when she moved to Utah. In her affidavit submitted to the court, C.C. attested that when she arrived in Utah, she and E.T. "had agreed that [she] would move to Utah to be closer to some of [her] friends and family" and "get settled in with the employment and housing opportunities that had prompted th[e] move." She also stated that the plan then was for E.T. to "come join [her] in Utah." E.T. confirmed this understanding. In his affidavit of paternity, E.T. stated that C.C. had "moved to Utah to be closer to friends and

_____

[5] *See In re Adoption of Baby B.*, 2012 UT 35, ¶¶ 42–43, 308 P.3d 382 (noting that a fact-intensive mixed determination is subject to deferential review on appeal).

[6] *See Jensen v. Intermountain Power Agency*, 1999 UT 10, ¶ 10, 977 P.2d 474 ("The question of the correct legal standard is a question of law, which we review for correctness.").

family" and that they had "agreed that [E.T.] would move to Utah and join her once she got settled in to [their] new apartment/home." These are core hallmarks of domicile—they indicate an intent to establish a new home and seek employment and housing opportunities. And they are the only pieces of evidence in the record that speak directly to C.C.'s intent upon moving to Utah. We reverse on that basis. We hold that the evidence in the record indicates that C.C. moved to Utah with the intent to remain here.

¶18 C.C. made untruthful statements about the identity of B.B.'s biological father. And her plans apparently changed soon after she arrived in Utah. But none of that undermines our conclusion about her intent at the time she first moved here. In fact, the evidence in the record about her change of plans is consistent with our analysis. In her affidavit, C.C. explained the change in plans, noting that "shortly after" arriving in Utah she met a former boyfriend who pressured her to reconcile with him and place the child for adoption. It was only then that C.C. stopped talking with E.T. and instructed family members to tell him that she "was fine" and "would soon return to South Dakota." That in no way undermines the conclusion that C.C. initially moved to Utah with the intent to remain here.

¶19 Because a change of domicile occurs once a person establishes physical presence in a new jurisdiction with the intent to remain, we hold that C.C. was a Utah domiciliary at the time of B.B.'s birth. On that basis we reject the first rationale for the district court's determination that it lacked jurisdiction—the conclusion that B.B. was domiciled on the reservation because his mother had retained that domicile.

## B. Abandonment

¶20 Above we noted that the United States Supreme Court has established a uniform federal standard of "domicile" under section 1911 of ICWA. *See supra* ¶ 14 (citing *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989)). The appellee in this case asserts that this decision extends to the question of abandonment. And he asks us to embrace the principles of abandonment set forth in the Restatement—a resource relied on extensively in *Holyfield*— in reviewing the district court's determination that C.C. abandoned her child and transferred the child's domicile to E.T. (who remained domiciled on the reservation).

¶21 The question whether ICWA requires the establishment of a uniform federal standard of abandonment is a difficult one.[7] We need not resolve it to decide this case, however, because the principles of abandonment in the Restatement are entirely consistent with Utah law. We thus review the district court's decision without resolving the question whether abandonment in a case like this one implicates a uniform federal standard or a state standard.

¶22 In the paragraphs below, we first present the settled principles of abandonment reflected in both the Restatement and Utah law. Applying these principles, we conclude that the district court erred in ruling that C.C. abandoned B.B. and thereby shifted the child's domicile to that of his biological father. Second, we respond to an implicit premise of the analysis of the district court

_____

[7] Because "abandonment [sometimes] affects domicile," the district court seems to have assumed that there must also be a uniform federal standard of abandonment in ICWA cases. And it is true that certain principles of "domicile" were federalized in *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30 (1989). But it may not follow that all subsidiary determinations that inform the domicile inquiry, such as abandonment, must also be conducted under a uniform federal standard. We see a number of grounds for disputing the breadth of such a conclusion: (a) "domicile" is a "critical term" in ICWA, *id.* at 44, whereas "abandonment" appears nowhere in the statute; (b) the elements of domicile that were federalized in *Holyfield* were matters involving "established common-law principles" that were "widely used" in courts throughout the country, *id.* at 47–48, while many questions affecting the law of abandonment differ from state to state; and (c) the policy concerns that motivated the decision in *Holyfield* are not implicated here.

To the extent the governing principle of abandonment turns on premises on which the states are in disagreement, and on which there is no "established" common-law standard, we see grounds for the conclusion that ICWA permits the application of each state's law. *See* 25 U.S.C. § 1901(5) (discussing the states' exercise of their "recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies"); *id.* § 1921 (requiring the application of state law whenever it "provides a higher standard of protection to the rights of the parent or Indian custodian of an Indian child" than ICWA or other federal law). But we need not resolve this question here for reasons explained herein.

and the appellee—the notion that the jurisdictional regime set forth in section 1911(a), as interpreted in *Holyfield*, prevents an unwed Indian mother from evading tribal jurisdiction even when she is no longer domiciled on the reservation if the child's biological father remains domiciled on the reservation. We show that this policy finds no support in ICWA and is actively undermined by *Holyfield*.

### 1. Effect of Abandonment on a Child's Domicile

¶23  Comment *c* to section 22 of the Restatement establishes the general rule that "[a]n illegitimate child has the domicil of his mother." This and other comments also set forth a range of exceptions to the general rule—circumstances in which the domicile of a child born out of wedlock may transfer to the domicile of someone other than the biological mother. The listed circumstances speak to the roles of adoptive parents (comment *g*) and unmarried biological fathers (comments *a* and *c*), making clear that the domicile of a child born out of wedlock and placed for adoption is that of the person who has parental rights in and obligations to the child. And they establish that parental rights and obligations—and thus domicile—remain with the birth mother unless and until someone else has assumed parental rights in and obligations to the child.

¶24 Yet another comment (comment *e*) establishes that an "abandonment" may also transfer a child's domicile. RESTATEMENT § 22 cmt. e. According to the Restatement, this occurs when a parent "deserts the child" or "gives the custody of the child to another with the intention of relinquishing his parental rights and obligations." *Id.* It was this comment—and this comment alone—that the district court decided to focus on. Citing this standard, the district court found that C.C. abandoned B.B. by "intend[ing] to relinquish all parental rights and obligations just two or three months into the pregnancy" and signing (invalid) relinquishment forms. It then claimed that "federal law require[d]" it to "look to Father's domicile" because when an Indian child is abandoned by one parent, "the tribe and the other parent domiciled on the reservation . . . still have an interest in the exercise of exclusive jurisdiction."[8]

---

[8] The claim that this is a "requirement" of federal law is incorrect because it relies on a quote from the *dissent* in *Holyfield*. *See* 490 U.S. at 63 (Stevens, J., dissenting). We therefore decline to address it further.

¶25   This was error. When other comments in the Restatement are also taken into account, it becomes clear that a birth mother's relinquishment of custody and signing away of parental rights in the formal adoption context does not amount to an "abandonment" because it is not done with the "intention of relinquishing . . . parental rights and obligations" immediately or unconditionally (let alone with an intent to surrender rights and obligations to an unmarried biological father who is not even a party to the adoption).[9] A birth mother's surrender of custody and waiver of her parental rights and obligations in the context of a formal adoption certainly evinces an intent to *eventually* turn over parental rights and obligations to a *specific*, state-vetted adoption agency or couple. But new rights in and obligations to the child will attach and replace the birth mother's only when certain conditions are met—once the adoption is final. And for that reason, it is wrong to say that a birth mother intends to immediately and unconditionally relinquish parental rights and obligations—walk away from or "abandon" her child—when she chooses to put her child up for formal adoption rather than simply leave him at the doorstep, daycare center, or family friend's home. In this case, C.C.'s "relinquishment of [her] parental rights and obligations" was both specific to the adoption setting and contingent on the finalization of the adoption. It was not done with an intent sufficient to constitute abandonment and transfer parental rights and obligations—along with the child's domicile—to a third party as of the date of the relinquishment form.

¶26 These conclusions follow from several of the other comments to section 22 of the Restatement. The starting point is comment *c*. That comment says that the domicile of a child born out of wedlock will follow the domicile of the mother except in specifically enumerated circumstances. *Id*. § 22 cmt. c. The listed circumstances include abandonment under comment *e* and conditions "stated immediately below" in comment *c*. *Id*. The conditions "immediately below" indicate that the domicile of a child born out of wedlock will transfer to the domicile of the biological father only in limited circumstances—such as when he marries the child's biological mother. Comment *c* states this point by negative (but clear) implication in the proviso that the child's domicile remains with the mother "[a]fter the mother's marriage to a man who is *not the child's father*." *Id.* (emphasis added). And the

_____

[9] While E.T. was eventually allowed to intervene in the case, he was not a party to the adoption proceedings in September 2014.

implication is made explicit in the general rule of comment *a*—that a child born in wedlock "is assigned the father's domicil."[10] *Id.* § 22 cmt. a. These provisions demonstrate that the domicile of a child born out of wedlock shifts to that of an unmarried biological father only when his inchoate parental rights are perfected, as upon marriage of the biological mother and father.[11] Where (as in the instant case) that has not happened, comments *a* and *c* establish that the child's domicile remains that of the mother.[12]

_____

[10] The full quote from comment *a* is that a "child is assigned the father's domicil when he lives with the father and has the same home as his." RESTATEMENT § 22 cmt. a. This adds another wrinkle for an unmarried biological father who has never lived with his child. Under the Restatement, even if E.T. married C.C. and thereby became B.B.'s legal father, B.B. would not acquire E.T.'s domicile unless and until B.B. lived with E.T. in his home.

[11] We need not and do not decide whether there are other events that could perfect an unwed biological father's parental rights and obligations. (If the unwed mother deserts both her child and the unwed father, perhaps that would be such an event.) We hold only that (1) the Restatement ties the domicile of a child born out of wedlock to parental rights and obligations, (2) C.C. did not give up parental rights and obligations in B.B. by initiating formal adoption proceedings, and (3) in any case, E.T. had not perfected his parental rights and obligations in B.B. when C.C. filed the adoption petition.

[12] The law of relevance to this point has evolved somewhat since the time of the Restatement. Today an unmarried biological father may have the right to notice of a pending adoption and the opportunity to contest the adoption. *See Lehr v. Robertson*, 463 U.S. 248, 261, 267–68 (1983) (holding that an unwed biological father that "demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child'" has a protected interest in "personal contact with his child" under the Fourteenth Amendment's Due Process Clause and that adoption statutes distinguishing between biological mothers and unwed biological fathers "may not constitutionally be applied in that class of cases where the mother and father are in fact similarly situated with regard to their relationship with the child" under the Equal Protection Clause (alteration in original) (citation omitted)). In the context of an adoption, the unmarried biological father has the *opportunity* to seek to have his inchoate parental rights perfected

(continued . . .)

¶27 Comment *g* is also significant because it speaks to the effect of an adoption proceeding on a child's domicile. This comment provides that the "effect of an adoption is to substitute a new parent-child relationship in place of that which formerly bound the child to his natural parents." *Id.* § 22 cmt. g. From that proviso, it is clear that a mother taking a step toward an adoption that is not yet final cannot amount to an immediate and unconditional intent to relinquish her parental rights and obligations (an abandonment), let alone an intent to relinquish them to the biological father.[13] Instead, the initiation of an adoption is the *start* of a process that *anticipates* the relinquishment of a birth mother's parental rights and obligations and the establishment of a new, specific parent-child relationship. When that process is complete, *then* "the domicil of the adopted child follows that of his adoptive parents." *Id.* But that shift in domicile does not take place until the adoption is final. The child "takes the domicil of the adoptive parent" only "at the moment of adoption." *Id.* These are settled principles of

_____

and established. *See id.* at 262 ("The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie." (footnote omitted)). But the upshot is the same—the child's domicile follows the *legal* parent, and thus does not shift to the unmarried biological father automatically just because he has made *some* attempt to assert his rights.

[13] This is reflected in well-established principles of law endorsed across the nation. *See* Stanton Phillips, *Adoption Law, Procedure and Practice*, *in* 6 FAMILY LAW AND PRACTICE § 64.10[1] (Arnold H. Rutkin ed., 2019) ("The properly executed consent to adoption does not, in and of itself, normally terminate the parental rights or responsibilities of the person signing the document. Rather, most jurisdictions do not terminate the parental rights of the parent until the granting of the final decree of adoption. . . . In most jurisdictions, the birth parents' parental rights remain in a state of legal limbo from the time of the signing of the consent to adoption until the entry of the final decree of adoption or legal termination of their rights.").

adoption law. A birth mother thus retains her rights and obligations to a child unless and until the adoption is finalized.[14]

¶28 These principles are also reflected in Utah law. The Utah Code expressly provides that "[a] pre-existing parent of an adopted child" retains "all parental rights and duties toward and all responsibilities for" an adopted child until "the earlier of: (a) the time the pre-existing parent's parental rights are terminated; or (b) . . . the time the final decree of adoption is entered." UTAH CODE § 78B-6-138(1). True, once a birth mother signs a valid consent and relinquishment form, her involvement in the proceeding is normally over—the adoption is finalized, and parental rights and obligations (and domicile) are transferred to the adoptive parents. This is because a valid consent and relinquishment document is irrevocable as a matter of Utah law. *See id.* § 78B-6-126. But such a document (even an effective, irrevocable one) does not itself shift parental rights (or domicile). The shift happens only if and when the adoption is finalized or parental rights are terminated in a valid order—a point the code confirms by acknowledging a court's authority to "enter a final order terminating parental rights before a final decree of adoption is entered." *Id.* § 78B-6-112(3).

¶29 The code confirms that unwed birth mothers remain legal parents in failed adoptions by providing that a parent's execution of a relinquishment of parental rights and consent to adoption "may not be considered as evidence" that the signatory "has neglected or abandoned the child" in a case in which "the court dismisses the adoption petition." *Id.* § 78B-6-133(4). This is significant. By stating that a relinquishment and consent "may not be considered" as evidence of neglect or abandonment in a case in which "the court dismisses the adoption petition," *see id.*, the legislature is clarifying that Utah law is in line with the settled standard set forth in the Restatement. The execution of this document may function as a relinquishment of parental rights and

_____

[14] We express no opinion on what challenges a birth mother may or may not face in regaining the ability to *exercise* these parental rights. *See id.* ("The period between the taking of the consent and the termination of parental rights leaves open a variety of issues. The child is still the *legal child* of the birth parent *but such rights* as care, custody, control or visitation with the child *are waived*. Those rights may be *restored* to a birth parent by an event, such as a fall-through in the adoptive placement. Obligations of the birth parent, particularly in the area of child support, will continue until the parental rights are terminated." (emphases added)).

obligations to an adoption agency or the adoptive parents if the adoption is finalized. But it does not amount to an "abandonment," or surrender of custody with an intent to immediately and unconditionally relinquish parental rights and obligations to anyone who might step into the parental role.[15]

¶30 The district court accordingly erred in its determination that C.C.'s relinquishment forms in the formal adoption context constituted an "abandonment" that resulted in the establishment of a perfected legal relationship between the child and his unwed biological father (and therefore a change in the child's domicile). The mother's consent to adoption does not itself evince an intent to immediately relinquish parental rights and obligations or establish a new parent-child relationship with *anyone*. C.C. continued to participate in the necessary court proceedings and did not leave Utah until after the court had entered an order purporting to terminate her parental rights. And a consent only waives the mother's rights vis-à-vis the adoption agency (or the prospective adoptive parents with whom the child is to be placed).

¶31 So C.C.'s parental rights appear to remain intact to this day[16]—although we again express no opinion on what steps she

---

[15] Appellants rightly called our attention to this statutory provision in their briefing. But they quoted the operative statutory language selectively, in a manner that was misleading. They quoted the general proviso that a relinquishment or consent "may not be considered as evidence" of abandonment, but omitted the above-noted qualifier—the language indicating that this principle applies only in a case in which "*the court dismisses the adoption petition.*" UTAH CODE § 78B-6-133(4) (emphasis added). That is troubling. Counsel should have quoted the full provision. The selective quote was misleading and inappropriate.

[16] The court did enter an order purporting to terminate C.C.'s parental rights based on her two signed relinquishment-and-consent documents. *In re Adoption of B.B.*, 2017 UT 59, ¶ 7, 417 P.3d 1. But the first one (signed the day after B.B.'s birth) was invalid as a matter of federal law because it failed to honor ICWA's ten-day waiting period. 25 U.S.C. § 1913(a) ("Any consent given prior to, or within ten days after, birth of the Indian child shall not be valid."). And the second one, though signed after the ICWA waiting period, was signed after the relevant date of the adoption petition. *See Holyfield*, 490 U.S. at 53 (holding that the

(continued . . .)

might need to take to be in a position to exercise those rights. *See supra* ¶ 27 n.14. Unless and until the adoption is finalized, B.B.'s domicile follows the domicile of his birth mother.[17] Everyone agrees that the initiation of adoption proceedings (to which C.C. consented) did not transfer domicile to that of the prospective adoptive parents. By the same logic, it didn't transfer domicile to that of a third party like E.T., either.

¶32 We are aware of no legal authority that says that a birth mother's consent to an adoption amounts to an abandonment—a surrender of custody with an immediate, unconditional intent to relinquish parental rights regardless of the outcome of the adoption proceeding.[18] To sustain the district court's holding, moreover, we

_____

tribal court had exclusive jurisdiction because the twin babies were domiciled on the reservation "when adoption proceedings were begun"); *In re Adoption of Halloway*, 732 P.2d 962, 966 (Utah 1986) (holding that "the propriety of [a] trial court's assumption of jurisdiction turns on [the Indian child's] domicile at the time the[] proceedings [a]re initiated"). In any event, that second consent was contingent on the entry of a final adoption order or an order terminating the birth mother's parental rights (conditions that have yet to occur). *See* UTAH CODE § 78B-6-138 (stating that a birth parent retains all rights and duties until "the earlier of: (a) the time the pre-existing parent's parental rights are terminated; or (b) . . . the time the final decree of adoption is entered").

[17] In the context of an ICWA jurisdictional determination, B.B.'s domicile remains that of his mother at the time the adoption petition was filed. *See supra* ¶ 31 n.16. C.C. could not shift B.B.'s domicile after the fact by changing her own domicile.

[18] The authority that we have found cuts directly against this proposition. In Utah and elsewhere, abandonment is the permanent relinquishment of all rights in and obligations to a child—the kind of relinquishment that results in "the destruction of the parent-child relationship." *See State in Interest of Summers Children v. Wulffenstein*, 560 P.2d 331, 334 (Utah 1977) ("[T]he father's conduct demonstrated a conscious disregard of the obligations owed by a parent to a child, leading to the destruction of the parent-child relationship—an abandonment."). And the destruction of a parent-child relationship necessarily requires the initiation of a new one. *See* HOMER H. CLARK, JR., 2 THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES § 21.1 (2d ed. 1987) ("As

(continued . . .)

would have to take this novel premise a step further. We would have to hold not only that a birth mother's consent to adoption is an abandonment or immediate and unconditional relinquishment, but also that her parental rights and obligations revert at the filing of the adoption petition to a third party whose parental rights are at best inchoate. This we decline to do.

¶33 So even if E.T. is correct that ICWA mandates a uniform federal standard of abandonment and the district court was correct to apply the standard found in section 22 of the Restatement, the district court's decision cannot stand. The Restatement regime necessarily ties domicile to parental rights and obligations.[19] And

_____

a result of the adoption decree the legal rights and obligations which formerly existed between the child and his natural parents come to an end, and are replaced by similar rights and obligations with respect to his new adoptive parents.").

A biological parent's consent to the initiation of an adoption proceeding may foreclose the right to rescind the relinquishment of parental rights vis-à-vis the adoption agency or prospective adoptive parents. *See* Phillips, *supra* ¶ 27 n.13, at § 64.10[1] ("The period between the taking of the consent and the termination of parental rights leaves open a variety of issues. The child is still the legal child of the birth parent but such rights as care, custody, control or visitation with the child are waived."); UTAH CODE § 78B-6-126 ("A consent or relinquishment is effective when it is signed and may not be revoked."). But we are aware of no authority that suggests such consent is an unconditional relinquishment foreclosing the restoration of parental rights when an adoption fails to come to fruition. Again, numerous authorities have reached the opposite conclusion. *See, e.g.*, Phillips, *supra* ¶ 27 n.13, at § 64.10[1] (explaining that parental rights "may be restored to a birth parent by an event, such as a fall-through in the adoptive placement"); UTAH CODE § 78B-6-138(1) (stating that a birth parent retains all rights and duties until "the earlier of: (a) the time the pre-existing parent's parental rights are terminated; or (b) . . . the time the final decree of adoption is entered").

[19] The dissent's contrary view rests on the unsupported assertion that "a finding of abandonment for purposes of domicile" "does not compel (or even influence)" a finding of abandonment "for purposes of adjudicating parental rights." *Infra* ¶ 132; *see also infra* ¶¶ 57 n.23, 95 n.29, 106, 116, 118 n.31, 128–31. But this

(continued . . .)

there is thus no basis for the determination that the birth mother's relinquishment and consent to B.B.'s adoption shifted parental rights and obligations—and domicile—to his biological father.

¶34 The dissent believes that it is comment *e* (which deals with "abandonment") that dictates the starting position in deciding the domicile of a child born out of wedlock and placed for adoption— not comment *c* (which deals specifically with "[i]llegitimate child[ren]") or comment *g* (which deals specifically with "[a]dopted child[ren]"). *See infra* ¶¶ 123–27. This is incorrect for at least two reasons.

¶35 First, B.B. is a child born out of wedlock and placed for adoption first and an (allegedly) abandoned child second. That alone should establish which comment sets the default rules in B.B.'s case—comment *c*, which (1) states that "[a]t *birth* an illegitimate child takes the domicil his mother has at the time as his domicil of *origin*" and (2) suggests (in conjunction with comment *a*) that the child's domicile will not shift to that of the unwed biological father except in limited circumstances—such as upon marriage. *See* RESTATEMENT § 22 cmt. c (emphases added). Likewise, comment *g* speaks to B.B.'s situation directly. It is undisputed that B.B. was placed for adoption. It is the entire subject of this appeal whether that placement also constituted abandonment.

---

distinction does not hold up under the law. The abandonment standard for domicile purposes is the abandonment standard for parental-rights purposes. The Restatement is not inventing a new, freestanding principle of "abandonment" for the purpose of establishing a child's domicile, as the dissent seems to believe. *See infra* ¶ 57 n.23 (lamenting the Restatement's word choice as "unfortunate"). It is invoking a preexisting, parental-rights standard of abandonment *in order to make* a conflict-of-law determination of domicile. The language of the Restatement confirms that its use of "abandonment" is an intentional effort to capitalize on a legal determination used to adjudicate parental rights and obligations: "[A]bandonment . . . occurs when the parent gives the custody of the child to another *with the intention of relinquishing his parental rights and obligations . . . . The rules of the forum are applied . . .* to determine whether an abandonment has taken place." RESTATEMENT § 22 cmt. e (emphasis added); *see also id.* ("*Under the local law of many states*, a child who has attained years of discretion becomes emancipated upon being abandoned by both parents." (emphasis added)).

¶36 Second, comment *c* (the comment governing "[i]llegitimate child[ren]") must set the default rule in this case because comment *e* assumes that the child at issue was born *in* wedlock—it presupposes that the child has taken on the domicile of his father. RESTATEMENT § 22 cmt. e (beginning by explaining what happens when a *father* abandons the child and declaring that "a child abandoned by both parents simultaneously *retains* the domicil of the *father* at the time of the abandonment." (emphases added)). But this is the default for children born *in* wedlock, *see id.* § 22 cmt. a ("[T]he child takes as his domicil of origin the domicil the father has at the time of the child's birth . . . ."), not those born outside it, *id.* § 22 cmt. c ("An illegitimate child has the domicil of his mother . . . ."). No doubt this is why Justice Stevens cited comment *i*'s standard—not comment *e*'s—in discussing what happens to the domicile of a child when she is "abandoned by both parents." *Holyfield*, 490 U.S. at 62 (Stevens, J., dissenting). Put simply, comment *e* starts from a place from which we know for a fact B.B. did not—a birth in wedlock.

¶37 For these reasons, we are not "discard[ing]" or "ignor[ing] the relevant comment—comment *e*." *Infra* ¶¶ 118, 125. We are reading it in the context of the default rules laid out for children born out of wedlock (comment *c*) and subsequently placed for adoption (comment *g*). Those comments capture the importance of parental rights and obligations to the domicile determination and explain B.B.'s situation perfectly. Holding up comment *e* without accounting for the Restatement's connection between parental rights and domicile—or the default rules that come with a child's out-of-wedlock birth status and prospective adoption—leaves all the important questions unanswered: With what "intention" did C.C. give up custody? Who had "parental rights and obligations" in B.B. at the time of the filing of the adoption petition? Despite its claim that we are "ignor[ing] comment *e*'s directive to examine Birth Mother's 'intention,'" *infra* ¶ 119, it is the dissent that glosses over these questions.

¶38 We are likewise not holding that comment *e*'s provision on abandonment "doesn't apply" "whenever an adoption looms in the background," *infra* ¶ 119, or "whenever the abandoning parent contemplates a future adoption," *infra* ¶ 127. We do not doubt that a parent "contemplat[ing] a future adoption" could still take actions that amount to an abandonment. We hold only that giving up custody and signing consent forms in order to start the formal adoption process does not itself constitute abandonment under the text of the Restatement. And we do so by focusing on the

"intention" with which a birth mother "gives . . . custody of the child to another,"[20] RESTATEMENT § 22 cmt. e, and by reading comment *e* in conjunction with the comments governing children born out of wedlock and placed for adoption. It is the dissent that insists that other comments in the Restatement simply don't apply in the circumstances we confront today. *See infra* ¶ 116 (suggesting comment *a* is "irrelevant"); *infra* ¶ 126 (claiming comment *g*—the comment governing "[*a*]*dopted child*[*ren*]"—is "irrelevant to this case").

### 2. Indian Parents' Domicile Changes under ICWA

¶39   In coming to a contrary conclusion, the district court seems to have assumed that the jurisdictional regime set forth in 25 U.S.C. section 1911(a) (as interpreted in *Holyfield*) prevents *any* Indian parent from evading exclusive tribal jurisdiction—even if she is no longer domiciled on the reservation—so long as the other Indian parent remains a domiciliary of the reservation. (The appellee appears to have made the same assumption.) The district court highlighted the United States Supreme Court's concerns about *reservation-domiciled* Indian parents "undermin[ing]" ICWA's jurisdictional regime and echoed the *Holyfield* dissent's assertion that even when an Indian child "is abandoned by one parent to a person off the reservation, the tribe and the other parent domiciled on the reservation . . . still have an interest in the exercise of exclusive jurisdiction." 490 U.S. at 63 (Stevens, J., dissenting). Likewise, E.T. claims that "C.C. cannot merely place the child for adoption in Utah with non-Indians . . . in an effort to circumvent the protections afforded the child's father and the Cheyenne River Sioux Tribe under ICWA."

¶40 This policy, however, finds no support in ICWA and is actively undermined by *Holyfield*. The concern that animates it, moreover, is completely obviated once we apply a correct standard of abandonment (informed not just by comment *e* taken out of context, but by other surrounding provisions).

¶41 This case is distinguishable from cases like *Holyfield* and *In re Adoption of Halloway*, 731 P.2d 962 (Utah 1986), in a significant respect. Here, the birth mother was *not* domiciled on an Indian

---

[20] The record facts speak volumes on C.C.'s "intention" with respect to her actions in these proceedings—she made arrangements with Heart to Heart, participated in the necessary court proceedings, and left Utah only once the district court had entered an order purporting to terminate her parental rights.

reservation. Rather, she moved to Utah and became a Utah domiciliary before she gave birth to her child. *See supra* ¶¶ 14–19. This is important, as neither *Holyfield* nor *Halloway* can be read to foreclose an Indian parent's right to legitimately change her domicile and invoke the jurisdiction of her state's courts.

### a. ICWA, *Holyfield*, and *Halloway*

¶42 Section 1911(a) is not a straitjacket requiring exclusive tribal court jurisdiction for any child born to Indian parents so long as one of them remains domiciled on the reservation. ICWA calls for exclusive tribal jurisdiction only where "an *Indian child* . . . resides or is domiciled within the reservation." 25 U.S.C. § 1911(a) (emphasis added). But again, the domicile of a child born out of wedlock follows the domicile of the mother. *See* RESTATEMENT § 22 cmt. c. So when the mother of an Indian child born out of wedlock leaves the reservation and establishes a new domicile in one of the states before the child's birth, there is no basis for the exclusive jurisdiction of a tribal court. An unwed mother who makes a legitimate change of domicile is not undermining the exclusive tribal court jurisdiction set forth in section 1911(a). *See* 25 U.S.C. § 1911(b) (granting tribal courts only concurrent jurisdiction where the Indian child is "not domiciled or residing within the reservation").

¶43 This is exactly in line with the holding of *Holyfield*. *Holyfield* says that section 1911(a) is offended where a mother domiciled on a reservation is allowed to "obtain[] an adoption decree in state court merely by transporting her [child] across state lines." 490 U.S. at 46. That is what happened in *Holyfield*. The birth parents were domiciled on an Indian reservation and briefly left the reservation just to give birth to twin children and place them for adoption in Mississippi. *Id.* at 37–38. Under well-established domicile standards followed in courts across the nation, the exclusive jurisdiction of the tribal court should have remained intact despite that temporary trip across state lines. The children should have been considered domiciliaries of the reservation because their domicile followed their mother and her brief trip across state lines did not change her domicile. Yet the Mississippi Supreme Court rejected that rule. Instead it held that the twins were not domiciled on the reservation because they had never "resided on or [been] domiciled within the territory set aside for the reservation." *Id.* at 39 (citation omitted). This was the holding reversed in *Holyfield*. And it was in rejecting that conclusion that the *Holyfield* court warned of the peril of allowing a party to circumvent the exclusive

jurisdiction of the tribal court "merely by transporting" a child "across state lines." *Id.* at 46.

¶44 But the *Holyfield* court never suggested that ICWA's exclusive-jurisdiction provision would be undermined if an Indian parent made a legitimate change of domicile. Quite the contrary. It specifically held that "the law of domicile Congress used in . . . ICWA cannot be one that permits individual *reservation-domiciled* tribal members to defeat the tribe's exclusive jurisdiction by the simple expedient of giving birth and placing the child for adoption off the reservation." *Id.* at 53 (emphasis added). We made this same point in *Halloway*. "To the extent that Utah abandonment law operates to permit [an Indian] mother to change [her child's] domicile as part of a scheme to facilitate his adoption by non-Indians *while she remains a domiciliary of the reservation*," we held that "it conflicts with and undermines the operative scheme established by [ICWA] to deal with children of *domiciliaries of the reservation* and weakens considerably the tribe's ability to assert its interest in its children." 732 P.2d at 969 (emphases added).

¶45 As we explain, the recognition that an Indian parent can *properly* "defeat" the tribal court's exclusive jurisdiction through a legitimate change of domicile was a point of common ground in *Holyfield*. The only disagreement went to the implication of that premise in a case in which the child remained domiciled on the reservation because the unwed mother did not enter the state with the intent to permanently remain.

### b. The *Holyfield* dissent

¶46 Justice Stevens asserted in dissent that the placement of the child for adoption was an "abandonment" sufficient to shift the child's domicile to that of the adoptive parents. 490 U.S. at 62 n.11 (Stevens, J., dissenting). He saw no difference under ICWA between an Indian parent's permanent change of domicile and an Indian parent's temporary trip across state lines to place a child for adoption. *Id.* at 60–63. Because the state courts would have been "required to give effect" to the Indian parents' "choice of jurisdiction" resulting from an actual change of domicile, Justice Stevens thought that the courts should likewise defer "when the parents . . . have expressed an unequivocal intent to establish a domicile for their children off the reservation." *Id.* at 62. Justice Stevens proposed a basis for this conclusion in the law of abandonment, citing the Restatement for the proposition that "[a]n abandonment occurs when a parent deserts a child and places the child with another with an intent to relinquish all parental rights

and obligations." *Id.* And he concluded that the parents in *Holyfield* had abandoned their children by placing them for adoption in Mississippi. *Id.* at 62 n.11.

¶47 Justice Stevens cited some of the Restatement principles discussed above in reaching this conclusion—noting, in particular, that when a "child is abandoned by both parents, he takes on the domicile of a person other than the parents who stands *in loco parentis* to him." *Id.* at 62. Because the parents in *Holyfield* relinquished their children for adoption under state law, Justice Stevens said they had abandoned them and shifted their domicile to that of the prospective adoptive parents. And Justice Stevens thought that "no purpose of the ICWA [wa]s served by closing the state courthouse door" to parents who had done so. *Id.* at 63. Thus, in Justice Stevens's view, ICWA "reflects a recognition that allowing [an Indian] tribe to defeat the parents' deliberate choice of jurisdiction would be conducive neither to the best interests of the child nor to the stability and security of Indian tribes and families." *Id.* at 60.

¶48 On this point the *Holyfield* majority disagreed. It thought that the Congress that enacted ICWA "was concerned not solely about the interests of Indian children and families, but also about the impact on the tribes themselves of the large numbers of Indian children adopted by non-Indians." *Id.* at 49 (majority opinion). And as noted above, the Court held that "the law of domicile Congress used in the ICWA cannot be one that permits individual reservation-domiciled tribal members to defeat the tribe's exclusive jurisdiction by the simple expedient of giving birth and placing the child for adoption off the reservation." *Id.* at 53. Applying these premises, the *Holyfield* majority rejected the *Holyfield* dissent's abandonment determination. It held that the exclusive jurisdiction of the tribal court (established by the fact that the parents, and thus their children, were domiciled on the reservation) could not be defeated by that fact that "the twins were 'voluntarily surrendered' by their mother" for adoption under state law. *Id.* at 49.

¶49 The interplay between the *Holyfield* majority and dissent confirms three main propositions of relevance to this case: (1) the dissent saw ICWA as respecting Indian parents' "deliberate choice of jurisdiction," *id.* at 60 (Stevens, J., dissenting), while the majority said that principle is limited by concerns about "impact[s] on the tribes themselves," *id.* at 34 (majority opinion); (2) both sides agreed that reservation-domiciled parents may defeat the exclusive jurisdiction of the tribal court by effecting a legitimate change in domicile; and (3) the majority held that there was no abandonment

sufficient to shift the children's domicile off the reservation while the dissent thought otherwise. Each of these points is significant. And together they sustain the conclusion we reach today.

¶50 The dissent in *Holyfield* clearly had a point about a reservation-domiciled parent's "deliberate choice of jurisdiction" under ICWA. Under the terms of section 1911(a), there is no doubt that Indian parents are entitled to evade the exclusive jurisdiction of the tribal courts by making a legitimate change in domicile. *See* 25 U.S.C. § 1911(a) ("An Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child *who resides or is domiciled within the reservation* of such tribe . . . ." (emphasis added)). This was common ground in *Holyfield*. *See* 490 U.S. at 48–49 ("It is undisputed in this case that the domicile of the mother (as well as the father) has been, at all relevant times, on the Choctaw Reservation. Thus, it is clear that at their birth the twin babies were also domiciled on the reservation, even though they themselves had never been there." (citation omitted)); *id.* at 62 (Stevens, J., dissenting) ("If [the Indian parents] had established a domicile off the reservation, the state courts would have been required to give effect to their choice of jurisdiction."). The disagreement went to whether a relinquishment for an adoption under state law is a parallel move by an Indian parent—the kind of move that merits respect as a "deliberate choice of jurisdiction." The majority said no. And that holding confirms the propriety of our abandonment analysis.

### c. Application to this case

¶51 If the abandonment standard endorsed by the district court and advocated by E.T. and (to a certain extent) the dissent were correct, then the parents in *Holyfield* would have abandoned their children and shifted their children's domicile off the reservation. The Indian parents in *Holyfield* left the reservation, gave up custody of their children, signed a consent-to-adoption form, and returned to the reservation. *Id.* at 37–38 (majority opinion). This was an abandonment under the standard E.T. advocates today. But such actions were deemed insufficient to constitute abandonment in *Holyfield*. *See id.* at 51 n.26 (dismissing the Mississippi Supreme Court's "conclusory" abandonment analysis and noting that the Indian parents' consent to termination of their parental rights was invalid under ICWA and as such could not make the twins non-domiciliaries of the reservation). Only the

*Holyfield* dissent advanced the view of abandonment E.T. asks us to affirm today.[21]

¶52 Justice Stevens was right that when both parents abandon a child, his domicile shifts to that of the "person other than the parents who stands *in loco parentis* to him." *Id.* at 62 (Stevens, J., dissenting) (quoting RESTATEMENT § 22 cmt. i). And of course prospective adoptive parents usually do step into that role. But Justice Stevens believed that a formal adoption amounts to abandonment. And that is incorrect. Neither parental rights and obligations nor domicile shifts upon the signing of a consent form or relinquishment of custody. So there is no abandonment at the operative moment of the initiation of the adoption in those circumstances. This is a key takeaway from *Holyfield*. And it defeats any concern about abandonment being used to circumvent the exclusive jurisdiction of the tribal courts in this manner.

_____

[21] This reveals another defect in the dissent's analysis—its proposed standard can be reconciled with ICWA precedent only by tacking on a "caveat[]" to the Restatement. The dissent claims that despite its text, the Restatement's abandonment standard can cut in only one direction—in favor of exclusive tribal court jurisdiction. *See infra* ¶ 98 (asserting that its "doctrine of abandonment cannot be used by Native American Indian parents as part of a scheme to facilitate adoption of their children by non-Indians while they remain domiciliaries of the reservation" (citation and internal quotation mark omitted)). In other words, giving up custody of a child and placing him for adoption is not a domicile-shifting abandonment unless it results in exclusive tribal jurisdiction. This is the only way to reconcile its standard with the result of *Holyfield*, as the dissent partially admits. *See infra* ¶ 98 ("This exception . . . fits the United States Supreme Court's decision in *Holyfield*, which . . . concluded . . . that the law of domicile Congress used in the ICWA cannot be one that permits individual reservation-domiciled tribal members to defeat the tribe's exclusive jurisdiction by the simple expedient of giving birth and placing the child for adoption off the reservation." (citation and internal quotation mark omitted)); *infra* ¶ 136 (citing this caveat as a reason its proposed standard would in fact have dictated the same result in *Holyfield*). And the fact that the dissent's interpretation of the Restatement requires a special caveat to comport with this court's and the High Court's precedent confirms that it is neither the most natural reading of the text nor the most advisable.

¶53 We decline to hold that ICWA mandates exclusive tribal court jurisdiction in any case in which either parent of an Indian child remains a domiciliary of the reservation, no matter what the reservation-domiciled parent's legal relationship to the child is at the time of the filing of the adoption petition. That view distorts the terms of 25 U.S.C. section 1911(a), which makes exclusive tribal jurisdiction turn on the domicile of the Indian *child*, not the Indian *parent*. And it runs counter to *Holyfield* and *Halloway* for the same reason. We reject it on that basis.

### III. CONCLUSION

¶54 The congress that enacted the Indian Child Welfare Act was understandably concerned about the effects of "abusive child welfare practices" in separating "large numbers of Indian children from their families and tribes through adoption or foster care placement." *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32 (1989). This federal statute, however, is not a directive for state courts to restructure settled doctrines of family law in an ongoing effort to advance those objectives alone. ICWA is a statute that balances multiple, competing policies, under terms and conditions voted into law in the text of ICWA.[22]

¶55 In *Holyfield*, the Supreme Court held that those terms and conditions demand the application of a uniform federal standard of "domicile" in determining whether a tribal court has exclusive jurisdiction under 25 U.S.C. section 1911(a). And that requirement, in turn, might ultimately direct us to incorporate a uniform federal standard of abandonment lifted from section 22 of the Restatement. But the district court did not follow that premise through to its logical conclusion. It took a single comment of that section out of context and established a novel standard of abandonment that runs counter to the Restatement as a whole and thwarts the express terms of the operative statute.

¶56 Section 1911(a) clearly allows an unwed birth mother initially domiciled on an Indian reservation to legitimately establish a new domicile in Utah and invoke the jurisdiction of the

---

[22] *See In re Adoption of B.B.*, 2017 UT 59, ¶ 180, 417 P.3d 1 (Lee, A.C.J., joined by Durrant, C.J., dissenting) (noting that ICWA is aimed not only at "protecting the integrity of Indian families" but also "at preserving the sovereignty of the state courts over adoption and paternity" and "protecting the children whose interests are so keenly implicated in adoption proceedings").

mother of that option, the district court was not advancing the purposes of ICWA or following a uniform federal standard of abandonment. It was advancing a new policy preference and causing unnecessary delay to the outcome of a proceeding in which time is of the essence. We reverse the district court on that basis, remanding the matter so that this adoption might be brought to a speedy conclusion.

———————

JUSTICE HIMONAS, dissenting:

## INTRODUCTION

¶57 The majority stumbles in holding that the Cheyenne River Sioux Tribe doesn't have exclusive jurisdiction over this case. Unlike the majority, I would hold that, for purposes of determining domicile under a conflict-of-laws analysis, B.B.'s birth mother abandoned him before the filing of the adoption petition.[23] And as a result of that abandonment, I would hold that B.B. took his birth father's domicile (the Cheyenne River Sioux Reservation) by the time of the filing. In these circumstances—when an Indian child is domiciled on a tribe's reservation—the plain language of the Indian Child Welfare Act (ICWA or the Act), 25 U.S.C. §§ 1901–63, vests exclusive jurisdiction over all child custody proceedings with the apposite tribal court. And because ICWA requires that we dismiss this case and cede jurisdiction to the Cheyenne River Sioux tribal court, I respectfully dissent.

## STANDARD OF REVIEW

¶58 We review questions of law for correctness, granting no deference to the lower court's decision. *See Smith v. Robinson*, 2018

_____

[23] The Second Restatement of Conflict of Laws uses the rather unfortunate verb *abandon* when writing about a child's domicile, and so I feel constrained to do the same. *See, e.g.*, RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 22 cmt. e (AM. LAW INST. 1971) ("[A] child domiciled with his mother and abandoned by her takes the domicil of his father if he has not been abandoned by him."). I say unfortunate because in the vernacular, in the context of the parent-child relationship, the word "abandoned" is pejorative, conjuring up images of parents furtively leaving their infants on the doorsteps of strangers. But in the parlance of the Second Restatement, even the most selfless behavior can constitute abandonment, such as when a mother places a child for adoption with the dream of improving that child's lot. *See infra* ¶¶ 100–10.

UT 30, ¶ 8, 422 P.3d 863. And we review a district court's findings of fact for clear error, setting aside those findings only if they're against the clear weight of the evidence. *See Fort Pierce Indus. Park Phases II, III & IV Owners Assoc. v. Shakespeare*, 2016 UT 28, ¶ 16, 379 P.3d 1218.

## ANALYSIS

¶59 We need to decide which court has jurisdiction over this case under ICWA. To answer that question, we have to decide where B.B. was domiciled when the adoption petition was filed. And to do that, we must analyze how abandonment affects an Indian child's domicile under ICWA.

¶60 I start with a review of ICWA and United States Supreme Court precedent interpreting ICWA. I conclude that ICWA and precedent mandate that courts apply a uniform federal standard of abandonment when determining whether abandonment has caused a change in an Indian child's domicile. I also conclude that the proper uniform federal standard of abandonment to establish domicile under ICWA is set forth in section 22 of the Second Restatement of Conflict of Laws. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 22 (AM. LAW INST. 1971) (hereinafter SECOND RESTATEMENT). By assessing the facts of this case under that standard, I show that the district court correctly determined that C.C. (Birth Mother) abandoned B.B. before the time of filing and that B.B. was therefore domiciled on the Cheyenne River Sioux Reservation when the adoption petition was filed. I thus conclude that under ICWA, the Cheyenne River Sioux tribal court has exclusive jurisdiction over this case and that we're obligated to dismiss it for want of subject matter jurisdiction.

## I. OVERVIEW OF ICWA

¶61 ICWA is a unique statute that represents an extraordinary act of federal intervention into an area of law generally reserved to the states. It helps to review both ICWA itself and United States Supreme Court precedent interpreting ICWA before delving into the legal analysis in this case.

### A. ICWA's Background, Congressional Findings, and Operative Provisions

¶62 To paint a clear picture of ICWA, I begin with the Act's background, and then I move on to its congressional findings, which are explicitly set forth in the Act itself. I end with its relevant operative provisions.

¶63 Congress passed ICWA in 1978 in response to "rising concern in the mid–1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes *through adoption* or foster care placement, usually in non-Indian homes." *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32 (1989) (emphasis added). Studies conducted in 1969 and 1974 estimated that 25 to 35 percent of all Indian children had been separated from their families and tribes and placed with adoptive families, foster care, or institutions. *Id.* Furthermore, about 90 percent of such adoptive placements were in non-Indian homes. *Id.* at 33.

¶64 Before enacting ICWA, Congress heard testimony from several witnesses that spoke to the effect that these adoptions had on Indian children, as well as on the parents and the tribes themselves. *Id.* Although most of the testimony focused on the harm to parents and children, there was also "considerable emphasis" on the harm to the tribes themselves caused by the "massive removal" of Indian children. *Id.* at 34. The Tribal Chief of the Mississippi Band of Choctaw Indians testified, for example, that Indian children are "the only real means for the transmission of tribal heritage" and that the removal of Indian children to non-Indian homes "seriously undercut[s] the tribes' ability to continue as self-governing communities." *Id.* He also testified that "[m]any of the individuals who decide the fate of our children are at best ignorant of our cultural values, and at worst contemptful of the Indian way and convinced that removal, usually to a non-Indian household or institution, can only benefit an Indian child." *Id.* at 35.

¶65 These concerns are reflected in the congressional findings of ICWA, which state that Congress found "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children." 25 U.S.C. § 1901(3). ICWA also recognizes that Congress found "that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people." *Id.* § 1901(5).

¶66 Based on these findings, Congress expressed its goal to protect Indian tribes, families, and children from the corrosive effect of the removal of Indian children from their families:

> [I]t is the policy of this Nation to protect the best
> interests of Indian children and to promote the

> stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture.

*Id.* § 1902.

¶67 The operative provisions of ICWA, in turn, reflect the congressional findings and declaration of policy. Relevant here, section 1911(a) provides that "[a]n Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law." *Id.* § 1911(a).

¶68 ICWA, then, goes to extraordinary lengths to delineate its own legislative intent: "to protect the rights of the Indian child as an Indian *and the rights of the Indian community and tribe in retaining its children in its society.*" *Holyfield*, 490 U.S. at 37 (emphasis added) (citation omitted).

### B. ICWA Domicile Under U.S. Supreme Court Precedent

¶69 Having discussed ICWA's background, congressional findings, and operative provisions, I now concentrate on how one of the Act's key terms—domicile—has been interpreted by the United States Supreme Court.

¶70 The Supreme Court addressed and explored the issue of domicile in an ICWA case in quite some depth. In *Holyfield*, the Court had to determine whether twin Indian children were domiciled on the Choctaw Reservation. 490 U.S. at 42. The twins were born out of wedlock to two enrolled members of the Mississippi Band of Choctaw Indians, both of whom were domiciled on the Choctaw Reservation. *Id.* at 37. The mother gave birth to the twins off the reservation—in Mississippi—and both parents executed consents to adoption in Mississippi state court. *Id.* at 37–38. The trial court issued a final decree of adoption a short while later. *Id.* at 38. The Mississippi Band of Choctaw Indians moved to vacate the adoption decree because, in its view, the tribal court retained exclusive jurisdiction over the proceedings under section 1911(a). *Id.* The trial court denied the motion, and the Supreme Court of Mississippi affirmed. *Id.* at 38–39.

¶71 In its opinion reversing the Supreme Court of Mississippi's decision, the U.S. Supreme Court began by noting that ICWA itself does not define "domicile" and that the "meaning of 'domicile' in the ICWA is . . . a matter of Congress' intent." *Id.* at 43. The initial question the Court had to confront, then, was "whether there is any reason to believe that Congress intended the ICWA definition of 'domicile' to be a matter of state law.'" *Id.* The Court held that there was no reason to look to state law, and that it was "beyond dispute that Congress intended a uniform federal law of domicile for the ICWA." *Id.* at 47. The Court based this conclusion on three premises, two of which are unique to ICWA.

¶72 The Court began with the general premise that "in the absence of a plain indication to the contrary, . . . Congress when it enacts a statute is not making the application of the federal act dependent on state law." *Id.* at 43 (alteration in original) (citation omitted). As the Court explained, the primary reason for this rule is that "federal statutes are generally intended to have uniform nationwide application." *Id.* And conditioning the application of a federal act on state law runs the risk that "the federal program would be impaired." *Id.* at 44 (citation omitted). The Court then looked to the purpose of ICWA to determine what Congress intended. In doing so, the Court found "two principal reasons" for the conclusion that Congress intended a uniform federal definition of domicile for ICWA. *Id.*

¶73 "First, and most fundamentally," the Court found that "the purpose of the ICWA gives no reason to believe that Congress intended to rely on state law for the definition of a critical term; quite the contrary." *Id.* at 44. Looking to the text of ICWA, as well as ICWA's legislative history, the Court determined that "Congress was concerned with the rights of Indian families and Indian communities vis-à-vis state authorities" and that "its purpose was, in part, to make clear that in certain situations the state courts did *not* have jurisdiction over child custody proceedings." *Id.* at 45. For that reason, the Court found it "most improbable that Congress would have intended to leave the scope of the statute's key jurisdictional provision subject to definition by state courts as a matter of state law."[24] *Id.*

---

[24] The Court's reference to ICWA's "key jurisdictional provision" is a reference to section 1911. *See Holyfield*, 490 U.S. at 36 ("At the heart of the ICWA are its provisions concerning jurisdiction over Indian child custody proceedings. Section 1911 lays out a dual jurisdictional scheme.").

¶74 Second, the Court noted the lack of nationwide uniformity that would result if domicile under ICWA hinged on state-law definitions of domicile. *Id.* The Court then explained that different states had ruled in opposite directions on factually similar cases that required an underlying finding of domicile—some finding the children to be domiciled on the reservation and others finding the children to be domiciled in the state. *Id.* at 45–46. The Court found that "a statute under which different rules apply from time to time to the same child, simply as a result of his or her transport from one State to another, cannot be what Congress had in mind." *Id.* at 46.

¶75 Having held that Congress intended for a uniform federal definition of domicile to control in ICWA cases, the Court then determined what that definition should be. To do so, the Court "look[ed] both to the generally accepted meaning of the term 'domicile' and to the purpose of the statute." *Id.* at 47.

¶76 Citing the Second Restatement of Conflict of Laws, the Court began by noting that domicile is "a concept widely used in both federal and state courts for jurisdiction and conflict-of-laws purposes, and its meaning is generally uncontroverted." *Id.* at 48 (citing SECOND RESTATEMENT §§ 11–23). A child born out of wedlock traditionally takes the domicile of its mother. *Id.* (citing SECOND RESTATEMENT § 22 cmt. c). Because it was undisputed in *Holyfield* that the mother was domiciled on the reservation, the twins were also domiciled on the reservation at birth. *Id.* at 48–49.

¶77 The Court then explained that the domicile of the twins could not be different "simply because the twins were 'voluntarily surrendered' by their mother." *Id.* at 49. This is because exclusive tribal jurisdiction under section 1911(a) "was not meant to be defeated by the actions of individual members of the tribe, for Congress was concerned not solely about the interests of Indian children and families, but also about the impact on the tribes themselves of the large numbers of Indian children adopted by non-Indians." *Id.* The Court thus thought it clear that "a rule of domicile that would permit individual Indian parents to defeat the ICWA's jurisdictional scheme is inconsistent with what Congress intended." *Id.* at 51.

## II. ABANDONMENT UNDER ICWA

¶78 This case turns on where B.B. was domiciled when the adoption petition was filed. *In re Adoption of Halloway*, 732 P.2d 962, 966 (Utah 1986) ("[T]he propriety of the trial court's assumption of jurisdiction turns on [the Indian child's] domicile at the time these proceedings were initiated."). Where B.B. was domiciled depends

on whether, for purposes of establishing B.B.'s domicile, Birth Mother abandoned B.B. before the filing of the adoption petition. We invited the parties to provide supplemental briefing on this issue. More specifically, we asked the parties to brief whether Congress intended for a uniform federal standard of abandonment to control in ICWA cases for purposes of establishing an Indian child's domicile and, if so, what that standard is. I conclude that Congress unmistakably intended for a uniform federal standard of abandonment to control in these cases. And I further conclude that the uniform federal standard of abandonment Congress intended is the one in the Second Restatement of Conflict of Laws.

### A. Abandonment Can Affect a Minor Child's Domicile

¶79 Upon birth, a child acquires a "domicile of origin," and that domicile continues until the child acquires a new domicile. *See Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989). Because most minors are legally incapable of forming the requisite intent to establish their own domicile, their domicile depends on the domicile of their parents. *Id.* When a child is born out of wedlock, the child's domicile of origin is that of the mother. *Id.*; *see also Halloway*, 732 P.2d at 966. This domicile continues until some action brings about a change of the child's domicile. *Halloway*, 732 P.2d at 966.

¶80 It is a generally accepted principle that, for conflict-of-laws purposes, abandonment of a minor child can change that child's domicile. This principle can be found in both the First and Second Restatements of Conflict of Laws. *See* RESTATEMENT (FIRST) OF CONFLICT OF LAWS § 33(1) (AM. LAW INST. 1934) ("[A] child abandoned by one parent has the domicil of the other parent, and . . . a child abandoned by both parents has the domicil of the parent who last abandoned it at the time of the abandonment; if both parents abandon it at the same time, it has the domicil of the father at the time of abandonment."); SECOND RESTATEMENT § 22 cmt. e ("If a child is abandoned by his father, he takes the domicil of his mother if he has not been abandoned by her. So too, a child domiciled with his mother and abandoned by her takes the domicil of his father if he has not been abandoned by him. Except as stated in Comments *f–i*, a child abandoned by both parents retains the domicil possessed by the parent who last abandoned him at the time of the abandonment; a child abandoned by both parents simultaneously retains the domicil of the father at the time of the abandonment.").

¶81 This principle can also be found in federal case law. *See, e.g., Simonds v. Simonds*, 154 F.2d 326, 327–28 (D.C. Cir. 1946) ("Customarily a legitimate child takes the domicile of the father if he be living. One of the recognized exceptions to the basic rule has grown from the abandonment situation. Where the father is found to have abandoned the child it will take the domicile of the mother during the remainder of its minority, provided, of course, that the mother has not also abandoned the offspring." (citations omitted)).

¶82 It turns up in state case law from around the country, too. *See, e.g., Allman v. Register*, 64 S.E.2d 861, 862 (N.C. 1951) ("Ordinarily the domicile of an unemancipated child, during its minority, follows that of the father. However, . . . where a father abandons the mother and child, the child's domicile follows that of the mother." (citations omitted)); *Halloway*, 732 P.2d at 966 ("The law of domicile applicable here is well-established. At birth, an illegitimate child acquires the domicile of his or her mother. If the parents abandon the child, the child acquires the domicile of the party who stands *in loco parentis* to him or her and with whom he or she lives at the time of abandonment. However, unless a child is abandoned, or his or her domicile is otherwise lawfully changed, the child retains the mother's domicile, even if he or she lives apart from her." (citations omitted)).

¶83 Most relevant to this case is the rule that "a child domiciled with his mother and abandoned by her takes the domicil of his father if he has not been abandoned by him." SECOND RESTATEMENT § 22 cmt. e; *see also* 25 AM. JUR. 2D *Abandoned Child* § 40 (2019) ("A child abandoned by the mother acquires the domicil of the father while a child abandoned by the father acquires the domicil of the mother.").

¶84 Here, the district court found that Birth Mother abandoned B.B. before the filing of the adoption petition and therefore that B.B. had taken E.T.'s (Birth Father's) domicile by the time of filing. Thus, the question we must answer is whether Birth Mother abandoned B.B. before the filing. To answer that question, I first determine what standard of abandonment applies to ICWA cases to establish an Indian child's domicile.[25]

---

[25] A footnote in *Holyfield* seems, at first blush, to suggest that it isn't a generally accepted principle that abandonment can carry out a change in a child's domicile. *See* 490 U.S. at 51 n.26 ("There is some

(continued . . .)

*B. ICWA and U.S. Supreme Court Precedent Mandate a Uniform Federal Standard of Abandonment to Establish Domicile Under ICWA*

¶85 ICWA and United States Supreme Court precedent require the courts to determine abandonment—for the purposes of establishing ICWA domicile—under a uniform federal standard. The majority doesn't decide this issue, claiming that "the principles of abandonment in the Restatement are entirely consistent with Utah law." *Supra* ¶ 21. Unlike the majority, I would decide this issue—given how essential it is to a proper domicile analysis—and conclude that a uniform federal standard applies because of ICWA itself and the U.S. Supreme Court's decision in *Holyfield*.

¶86 ICWA does not mention the words "abandon" or "abandonment," let alone define them. But ICWA does use the word "domicile," and the exclusive-jurisdiction provision in section 1911(a) depends on the Indian child's domicile. And while

_____

authority for the proposition that abandonment can effectuate a change in the child's domicile, *In re Adoption of Halloway*, 732 P.2d at 967, although this may not be the majority rule. *See* SECOND RESTATEMENT § 22 cmt. e (abandoned child generally retains the domicile of the last-abandoning parent)."). But the correct reading of this footnote is that abandonment does not always *necessarily* effect a change in a child's domicile. *Holyfield*'s citation to comment *e* of the Second Restatement proves this point. Comment *e* does provide that an abandoned child generally retains the domicile of the last-abandoning parent, as the footnote in *Holyfield* suggests, but only if the child is abandoned by both parents. SECOND RESTATEMENT § 22 cmt. e ("[A] child abandoned by both parents retains the domicil possessed by the parent who last abandoned him at the time of the abandonment."). So, when the child has been abandoned by both parents, an "abandoned child generally retains the domicile of the last-abandoning parent," as *Holyfield* suggests. 490 U.S. at 51 n.26. In that context, abandonment would not necessarily effect a change in a child's domicile—assuming the child's domicile was already that of the last-abandoning parent. But as comment *e* also provides, abandonment can and does bring about a change in a child's domicile under other circumstances. *See* SECOND RESTATEMENT § 22 cmt. e ("If a child is abandoned by his father, he takes the domicil of his mother if he has not been abandoned by her. So too, a child domiciled with his mother and abandoned by her takes the domicil of his father if he has not been abandoned by him.").

ICWA itself does not define "domicile," the U.S. Supreme Court did so in *Holyfield*.

¶87  As discussed above, *see supra* ¶¶ 72–74, the *Holyfield* court found that it is "most improbable that Congress would have intended to leave the scope of [section 1911] subject to definition by state courts as a matter of state law" and that "a statute under which different rules [of domicile (and thus of jurisdiction)] apply from time to time to the same child, simply as a result of his or her transport from one State to another, cannot be what Congress had in mind." 490 U.S. at 45–46. *Holyfield* therefore held that "Congress intended a uniform federal law of domicile for the ICWA." *Id.* at 47. So, while we may lack explicit guidance on the narrow issue of how abandonment affects domicile under ICWA, we emphatically don't lack for guidance on how the law of domicile is supposed to function under ICWA.

¶88  If there's to be a true uniform federal law of domicile for ICWA, then subsidiary determinations that effectively determine the domicile question, such as abandonment, must also rest on uniform federal law.[26] If different standards of abandonment were to apply to the domicile inquiry depending on the state in which the proceeding takes place, then the work of *Holyfield* requiring a uniform federal law of domicile for ICWA would be all but undone. Applying state abandonment law to determine domicile would lead to an ICWA "under which different rules [of domicile (and thus of jurisdiction)] apply from time to time to the same child, simply as a result of his or her transport from one State to another," a result that *Holyfield* declared "cannot be what Congress had in mind." *Id.* at 46. So, I think it beyond dispute that, given Congress's intent to have a uniform federal law of domicile to control in ICWA cases, Congress also intended for a uniform federal standard of abandonment to establish domicile under ICWA.

### C. The Uniform Federal Standard of Abandonment Is in the Second Restatement of Conflict of Laws

¶89 Having established that a uniform federal standard of abandonment must control in ICWA cases to determine domicile, I now turn to what that standard is. After considering the parties' arguments and surveying domicile law, I conclude that the best recitation of a uniform federal standard of abandonment to

---

[26] "Whether a child has been abandoned so as to bring the case within the scope of this Comment *is a question involving the rules of domicil*." SECOND RESTATEMENT § 22 cmt. e (emphasis added).

determine domicile in ICWA cases is in the Second Restatement of Conflict of Laws: "An abandonment [for purposes of establishing the domicile of a minor] occurs in two situations. It occurs when the parent deserts the child; it likewise occurs when the parent gives the custody of the child to another with the intention of relinquishing his parental rights and obligations." SECOND RESTATEMENT § 22 cmt. e; *accord Halloway*, 732 P.2d at 966 ("As a general matter, abandonment occurs when a parent deserts a child or places a child with another with an intent to relinquish all parental rights and obligations."). Thus, I would hold that, to determine domicile in ICWA cases, an abandonment occurs when: (1) a parent deserts their child; or (2) a parent gives the custody of their child to another with the intention of relinquishing their parental rights and obligations, which is precisely what occurs in an adoption. I reach this conclusion for many reasons.

¶90 Restatements generally provide a helpful overview of the law as it exists across the country. "Restatements of law published by the American Law Institute purport to offer a synthesis of American common law, which articulates the reasoned, mainstream, modern consensus on principles of broad application intended to govern large numbers of cases." *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 353 (Pa. 2014). This means that restatements can be especially useful in a case such as this in which we must explain a uniform federal standard without express direction from Congress.[27]

¶91 Beyond just having theoretical value as a bellwether of what uniform federal standard of abandonment should apply here, the Second Restatement has been central to ICWA cases that turn on a determination of an Indian child's domicile.

¶92 Perhaps most importantly, the United States Supreme Court relied heavily on the Second Restatement in deciding *Holyfield*. The *Holyfield* majority cited the Second Restatement's chapter on domicile for the proposition that domicile is "a concept widely used in both federal and state court for jurisdiction and

---

[27] In this spirit, this court has previously looked to restatements to help gain a better understanding of certain law as it exists across the country. For example, this court recently looked to restatements "as helpful bookends in our survey of the 'generally recognized [law] in a majority of jurisdictions.'" *C.R. England v. Swift Transp. Co.*, 2019 UT 8, ¶ 18, 437 P.3d 343 (alteration in original) (citation omitted).

conflict-of-laws purposes, and its meaning is generally uncontroverted." 490 U.S. at 48 (citing SECOND RESTATEMENT §§ 11–23). The *Holyfield* majority also cited the Second Restatement for the proposition that children born out of wedlock traditionally take the domicile of their mother at birth. *Id.* (citing SECOND RESTATEMENT § 22 cmt. c). Both propositions were crucial to the Court's conclusion that, under generally accepted law of domicile, the twins took the domicile of their biological mother at birth. *See id.* at 48–49 ("It is undisputed in this case that the domicile of the mother (as well as the father) has been, at all relevant times, on the Choctaw Reservation. Thus, it is clear that at their birth the twin babies were also domiciled on the reservation, even though they themselves had never been there." (citation omitted)).

¶93 Even the dissent in *Holyfield* contemplated the abandonment issue and drew from the Second Restatement in its analysis. The dissent pointed out that the twins in *Holyfield* may have been abandoned by both parents. *Id.* at 62. And the dissent turned to the Second Restatement for a standard of abandonment: "[a]n abandonment occurs when a parent deserts a child and places the child with another with an intent to relinquish all parental rights and obligations." *Id.* (citing SECOND RESTATEMENT § 22 cmt. e). So, while the *Holyfield* majority didn't address the issue of abandonment—and therefore we have no binding Supreme Court precedent on the issue—it's persuasive that both the majority and the dissent chose to draw heavily from the Second Restatement, with the latter raising it in its discussion of abandonment. At the very least, this gives us some insight into what the Supreme Court might consider to be a uniform federal standard for abandonment when determining domicile in ICWA cases.

¶94 The U.S. Supreme Court isn't the only court to have looked to the Restatement when faced with the issue of an abandonment potentially affecting domicile in an ICWA case. Quite the opposite. The Restatement's standard for abandonment appears to be a mainstay of post-*Holyfield* opinions that have confronted this issue. In *In re Adoption of S.S.*, the Illinois Supreme Court cited the Restatement when it recognized that there are exceptions to the general rules of domicile in cases involving abandonment and that "[f]or purposes of establishing domicile, abandonment occurs when the parent deserts the child or when the parent gives custody of the child to another with the intention of relinquishing his parental rights and obligations." 657 N.E.2d 935, 942 (Ill. 1995). Similarly, the Colorado Court of Appeals has concluded that the common-law concept of abandonment in the Restatement and cited

in the *Holyfield* dissent could properly "determine whether the child [in that case] has been abandoned so as to change his domicile for the purpose of determining jurisdiction under the ICWA." *In re S.M.J.C.*, 262 P.3d 955, 962 (Colo. App. 2011), *cert. granted, judgment vacated*, No. 11SC371, 2011 WL 4018031 (Colo. Sept. 12, 2011).[28] Likewise, the Western District of Oklahoma has relied on the Restatement in assessing how abandonment affects the domicile of an Indian Child. *Comanche Indian Tribe of Okla. v. Hovis*, 847 F. Supp. 871, 880–84 (W.D. Okla. 1994), *rev'd on other grounds*, *Comanche Indian Tribe of Okla. v. Hovis*, 53 F.3d 298 (10th Cir. 1995). Although the Western District of Oklahoma didn't discuss the standard for abandonment set out in comment *e* to section 22 of the Second Restatement—and relied on by the *Holyfield* dissent, *In re Adoption of S.S.*, and *In re S.M.J.C.*—the court did cite extensively to section 22 generally in making its abandonment determination. *Id.* at 880–84. In sum, these cases demonstrate that courts at both the federal and state levels have turned to the Restatement to assess whether an abandonment has effectuated a change of domicile in ICWA cases.

¶95 Given the general purpose of the Restatement—to survey broad swaths of common law and distill widely applicable rules of law—and given the citations to the Second Restatement in ICWA cases from courts across the country, I believe that the standard of abandonment in the Second Restatement is the best approximation of the uniform federal standard Congress intended. As a result, an abandonment occurs for purposes of establishing domicile in ICWA cases when (1) a parent deserts their child or (2) a parent

---

[28] The Colorado Supreme Court vacated the judgment in *In re S.M.J.C.* and remanded to the trial court for factual findings on the issue of abandonment in light of its ruling in *D.P.H. v. J.L.B.*, 260 P.3d 320 (Colo. 2011), which was a non-ICWA case that clarified the factual findings that a trial court must make before making a finding of abandonment for purposes of terminating parental rights, *see id.* at 324–26. To the extent that the Colorado Supreme Court intended for the *In re S.M.J.C.* trial court to rely on state standards of abandonment for terminating parental rights on remand in order to make a determination of domicile in an ICWA case, I respectfully submit that this isn't what Congress intended. *See supra* ¶¶ 85–88.

gives custody of their child to another with the intention of relinquishing their parental rights and obligations.[29]

### D. Caveats to Second Restatement Standard

¶96 Having identified a uniform federal standard of abandonment, I now quickly note two caveats to the Restatement standard that are dictated by ICWA.

¶97 First, the language in the Second Restatement stating that the "rules of the forum are applied . . . to determine whether an abandonment has taken place" is inapplicable in ICWA cases. SECOND RESTATEMENT § 22 cmt. e. Instead, the rules applied in ICWA cases are simply the rules from the Second Restatement itself as I have set forth in this dissenting opinion. This is so because *Holyfield* requires a uniform federal law of domicile in ICWA cases. For that reason, the *Holyfield* court similarly concluded that because Congress could not have intended for different rules of domicile to apply simply as a result of an Indian child's transport from state to state, "the general rule [from the Second Restatement] that domicile is determined according to the law of the forum can have no application here." 490 U.S. at 46 n.21 (citation omitted). Because domicile can turn on abandonment, the abandonment inquiry must also be conducted on a uniform federal basis, not according to the rules of the forum.

¶98 Second, I agree with the Illinois Supreme Court that "the doctrine of abandonment cannot be used by Native American

_____

[29] Appellants R.K.B. and K.A.B. rightly point out that ICWA requires the application of state law if the relevant state law provides a higher standard of protection of parental rights to an Indian child than those provided under ICWA. *See* 25 U.S.C. § 1921. This "ensur[es] that parents of Indian children enjoy the highest level of protection of their parental rights available." *In re Adoption of B.B.*, 2017 UT 59, ¶ 67, 417 P.3d 1. R.K.B. and K.A.B. argue that Utah state abandonment law should apply here if that application would result in greater protection of Birth Mother's rights, such as her right to have the consequences of a voluntary relinquishment explained to her under section 1913(a), her right to withdraw her consent to adoption at any time prior to the entry of a final decree under section 1913(c), and her right to object to transfer to a tribal court under section 1911(b). These arguments are totally misplaced, however, because a finding of abandonment for purposes of establishing an Indian child's domicile doesn't affect Birth Mother's parental rights under ICWA. *Infra* ¶¶ 128–32.

Indian parents as part of a scheme to facilitate adoption of their children by non-Indians while they remain domiciliaries of the reservation." *In re Adoption of S.S.*, 657 N.E.2d at 942. This exception aligns with our decision in *Halloway*, in which this court expressed that Utah's abandonment law "conflicts with and undermines the operative scheme established by [section 1911(a)] to deal with children of domiciliaries of the reservation and weakens considerably the tribe's ability to assert its interest in its children" if it "operates to permit [a parent] to change [a child's] domicile as part of a scheme to facilitate [the child's] adoption by non-Indians while [the parent] remains a domiciliary of the reservation." 732 P.2d at 969. It also fits the United States Supreme Court's decision in *Holyfield*, which cited *Halloway* favorably and concluded, "We agree with the Supreme Court of Utah that the law of domicile Congress used in the ICWA cannot be one that permits individual reservation-domiciled tribal members to defeat the tribe's exclusive jurisdiction by the simple expedient of giving birth and placing the child for adoption off the reservation." 490 U.S. at 53. Because I ultimately conclude that exclusive jurisdiction lies with the Cheyenne River Sioux tribal court, *see infra* ¶ 137, I need not consider this exception here.

## III. BIRTH MOTHER ABANDONED B.B.

¶99 I next turn to the issue of whether Birth Mother abandoned B.B. under the uniform federal standard of abandonment. I agree with the majority that Birth Mother was domiciled in Utah when the adoption petition was filed.[30] Below, I show that Birth Mother had abandoned B.B. for the purposes of domicile by the time the adoption petition was filed. Then I show why, under the Restatement standard, the majority errs by holding that B.B.'s domicile didn't shift to that of his father before the filing.

_____

[30] I note, however, that Birth Mother submitted an affidavit in the district court after this appeal was filed that cuts against that finding. She testified in the affidavit that "she went to Utah to have the baby because [she] did not want anyone interfering with [her] choice of putting [her] son up for adoption," that "she told people [she] was going to Utah for other reasons, but the adoption was the actual reason," and that she "intended to return to South Dakota after placing [her] son for adoption." But I don't consider this affidavit on appeal because it's not part of the appellate record, was unavailable to the district court when making its decision, and hasn't been brought to our attention by the parties.

### A. Birth Mother Gave Up Custody of B.B. with the Intention of Relinquishing Her Parental Rights

¶100   Whether Birth Mother gave custody of B.B. to another with the intent to relinquish her parental rights is a question of fact that this court reviews for clear error. *See Fort Pierce Indus. Park Phases II, III & IV Owners Assoc. v. Shakespeare*, 2016 UT 28, ¶ 16, 379 P.3d 1218. The district court found that "Birth Mother abandoned B.B. as that term is used in . . . the Restatement (Second) of Conflict of Laws § 22 Comment e." Because I find ample support for the district court's factual findings in the record, I conclude that the district court's findings were not clearly erroneous.

¶101   The district court found that Birth Mother had abandoned B.B. for three reasons: (1) "Birth Mother, prior to B.B.'s birth, intended to relinquish all parental rights and obligations"; (2) "just over 24 hours after birth she formally relinquished her parental rights"; and (3) "she then came into Court a few days later to again relinquish her parental rights—executing the consent to adoption in court." The district court also found that Birth Father was domiciled on the Cheyenne River Sioux Reservation when the adoption petition was filed. That's why the district court found that B.B.'s domicile at that time was the Cheyenne River Sioux Reservation.

¶102   To support a finding of abandonment under the Second Restatement, Birth Mother must have either (1) deserted B.B. or (2) given custody of B.B. to another with the intention of relinquishing her parental rights and obligations. Neither party asserts that Birth Mother deserted B.B.; nor did the district court make any factual findings on that question. So, I review the district court's findings only as to the second type of abandonment—whether Birth Mother gave custody of B.B. to another with the intent to relinquish her parental rights before the adoption petition was filed. She unquestionably did so.

¶103   First, Birth Mother gave up custody of B.B. before the adoption petition was filed. Although the district court's ruling does not directly discuss whether Birth Mother had given up custody of B.B. by the petition's filing, the parties agree—and the record supports a finding—that Birth Mother had indeed done so. And when asked at oral argument, appellants R.K.B. and J.K.B. confirmed that they had taken physical custody of B.B. before the filing. This is also corroborated by the transcript of a hearing on the adoption petition held after the filing, in which the judge remarked that R.K.B. and J.K.B. had "a beautiful little [baby] with [them] [that

day]," showing that B.B. arrived to court that day with R.K.B. and J.K.B. So although the district court didn't make an explicit finding of fact about whether Birth Mother gave up custody of B.B. before the filing of the adoption petition, neither party disputes this fact and the record evidence supports such a finding. I thus conclude that Birth Mother had given up custody of B.B. by the time the adoption petition was filed.

¶104   Second, the district court didn't clearly err in finding that Birth Mother intended to relinquish her parental rights. Birth Mother formed the intent to place B.B. for adoption months before delivery. At her deposition, Birth Mother said that she first decided to place B.B. for adoption "probably a couple months into the pregnancy . . . like two, three months into the pregnancy." She also said that she first contacted the adoption agency, Heart to Heart, four to five months before B.B.'s birth.

¶105   Birth Mother not only formed an intent to place B.B. for adoption, but she also followed through on that intent soon after B.B.'s birth. Just twenty-four hours after B.B.'s birth, Birth Mother signed a notarized document titled "Relinquishment of Parental Rights and Consent of Natural Birth Mother to Adoption." Both the introductory and concluding paragraphs of that document provide that "[b]y signing this document you are giving up your rights as a parent" and that "[y]ou cannot revoke the consent to your child's adoption once you sign this document." And the last line item that Birth Mother initialed states, "I understand that if I choose adoption for my child and sign the relinquishing papers, all my rights and responsibilities for this child will be ended, and that my consent is final, irrevocable and legally binding." The consent to adoption also states, "I, [Birth Mother] do hereby relinquish and surrender said child for adoption to: Heart to Heart Adoptions." Birth Mother initialed every line item and signed the consent to adoption.

¶106   To be sure, this consent to adoption would not be legally sufficient to terminate Birth Mother's parental rights under ICWA, which prohibits any consent being given within ten days after the birth of an Indian child. *See* 25 U.S.C. § 1913(a). But it's still highly indicative of Birth Mother's *intent* to relinquish her parental rights for the purposes of abandonment. *See Holyfield*, 490 U.S. at 62 n.11 (Stevens, J., dissenting) ("[E]ven a consent to adoption that does not meet statutory requirements may be effective to constitute an abandonment and change the minor's domicile."); *In re Adoption of M.L.L.*, 810 N.E.2d 1088, 1092 (Ind. Ct. App. 2004) (holding that a birth mother abandoned her child for purposes of jurisdiction

under the Uniform Child Custody Jurisdiction Act when she took the child to live with a couple in another state, "signed a consent to guardianship and a consent to adopt, and helped them pack [her child's] belongings, including [the child's] birth certificate and social security card").

¶107 Apparently not content with signing only the consent to adoption, Birth Mother also signed a statement about paternity in which she fraudulently named her brother-in-law as the biological father of B.B. Based on this misrepresentation, Heart to Heart and counsel for R.K.B. and J.K.B. had Birth Mother's brother-in-law sign an affidavit declaring that he was B.B.'s biological father, relinquishing his rights to B.B., consenting to the adoption, and declaring that he was neither an enrolled member of nor eligible for membership in a Native American tribe. As we noted in *In re Adoption of B.B.*, Birth Mother seems to have had her brother-in-law sign the affidavit "in order to make the adoption go faster." 2017 UT 59, ¶ 87, 417 P.3d 1.

¶108 Birth Mother's actions before the filing are sufficient on their own to support a finding of abandonment, but her postpetition actions confirm that she intended to relinquish her parental rights by the time the adoption petition was filed. Specifically, Birth Mother, a few days after the filing, appeared in court and signed a document entitled "Voluntary Relinquishment of Parental Rights, Consent to Adoption, and Consent to Entry of Order Terminating Parental Rights." In this sworn document, Birth Mother stated, "I hereby voluntarily relinquish permanently and completely all of my parental rights and interests in the guardianship, custody, care and control of B.B. to Heart to Heart Adoptions." She also reaffirmed her earlier untrue statement that her brother-in-law was B.B.'s biological father and confirmed that she understood that, by voluntarily relinquishing her parental rights, she would "be relieved of all parental duties, obligations and responsibilities" and "have no further rights regarding future care, custody, visitation or adoption" of B.B.

¶109 Appellants R.K.B. and K.A.B. argue that this postpetition reaffirmation is irrelevant to whether Birth Mother abandoned B.B. before the petition. I disagree because the reaffirmation helps clarify Birth Mother's intent before the filing, much in the same way district courts may "allow parties to use post-breach evidence to establish and measure their expectation damages." *Trans–W. Petroleum, Inc. v. U.S. Gypsum Co.*, 2016 UT 27, ¶ 21, 379 P.3d 1200. The district court thus didn't abuse its discretion by considering it.

¶110   In sum, the record evidence confirms the district court's finding that Birth Mother intended to relinquish her parental rights to B.B. by the time the adoption petition was filed.

### B. The Majority Errs in Interpreting and Applying the Second Restatement Standard

¶111   The majority holds that "giving up custody and signing consent forms in order to start the formal adoption process does not itself constitute abandonment under the text of the Restatement." *Supra* ¶ 38. It also holds that B.B.'s domicile did not shift to that of his birth father at the time of the filing. *Supra* ¶ 2. That holding is based mainly on a misreading of the Second Restatement but also on some faulty assumptions about abandonment in the domicile context.

¶112   The proper interpretation of the Second Restatement—that the domicile of a child born out of wedlock switches to that of his father upon being abandoned by his mother—flows from a straightforward reading of its text. That's all that we need because the Second Restatement addresses head-on how to determine the domicile of a child born out of wedlock. The analysis it provides is simple and starts with the general rule in comment *c* that a child born out of wedlock "has the domicil of his mother." SECOND RESTATEMENT § 22 cmt. c. Comment *c* then points us to comments *e* through *i* for exceptions to this general rule. *Id.* Two of these exceptions merit some discussion here. One kicks in when the child born out of wedlock is abandoned (comment *e*). *Id.* cmt. e. The other comes into play when the child born out of wedlock becomes adopted (comment *g*). *Id.* cmt. g.

¶113   I discuss comment *g* below; for now, I focus on comment *e*. Comment *e*, entitled "abandoned child," states that a "child domiciled with his mother and abandoned by her takes the domicil of his father if he has not been abandoned by him." *Id.* cmt. e. What it means to abandon a child is also found in comment *e*: "An abandonment, as the term is used here, . . . occurs when the parent deserts the child; it likewise occurs when the parent gives the custody of the child to another with the intention of relinquishing his parental rights and obligations." *Id.*

¶114   These provisions are clear-cut. A child born out of wedlock has the domicile of his mother. *Id.* cmt. c. That means that B.B. (a child born out of wedlock) would normally have Birth Mother's domicile. But if the mother abandons the child—if the mother deserts the child or "gives the custody of the child to another with the intention of relinquishing [her] parental rights and

obligations"—the child "takes the domicil of his father if he has not been abandoned by him." *Id.* cmt. e.

¶115   One crucial question thus determines the outcome of this appeal: Did Birth Mother, before the adoption petition's filing, abandon B.B. by giving custody of B.B. to another with the intention of relinquishing her parental rights and obligations? The answer, as shown above, is unquestionably yes. *Supra* ¶¶ 100–10. And, as a result, B.B. took the domicile of Birth Father (the Cheyenne River Sioux Reservation), giving the tribal court exclusive jurisdiction over B.B.'s adoption proceedings.

¶116  The majority rejects this uncomplicated analysis, misreading the Second Restatement. First, it eschews the Second Restatement's clear provisions, almost ignoring its key provisions while overemphasizing irrelevant ones. Second, it confuses abandonment in the domicile context with abandonment in the termination-of-parental-rights context. Third, it asserts that if the abandonment standard that I endorse "were correct, then the parents in *Holyfield* would have abandoned their children and shifted their children's domicile off the reservation." *Supra* ¶ 51.

1. The Majority Misinterprets the Second Restatement

¶117   The majority misinterprets section 22 of the Second Restatement in two key ways. First, it errs by concluding "that the domicile of a child born out of wedlock will transfer to the domicile of the biological father only in limited circumstances—such as when he marries the child's biological mother." *Supra* ¶ 26. Second, it errs by assuming that abandonment for the purposes of domicile doesn't apply in the adoption context. *Supra* ¶ 25. These errors are intertwined, and so I discuss each of them throughout this section.

¶118   The majority correctly recognizes the general rule for the domicile of a child born out of wedlock, which is in comment *c*. *Supra* ¶ 26. But it doesn't pay respect to a key exception that comment *c* scoops out of that general rule: the exception for abandoned children (comment *e*). SECOND RESTATEMENT § 22 cmt. e. The majority discards comment *e* because it believes that "a birth mother's relinquishment of custody and signing away of parental rights in the formal adoption context does not amount to an 'abandonment' because it is not done with the 'intention of relinquishing . . . parental rights and obligations' immediately or unconditionally (let alone with an intent to surrender rights and obligations to an unmarried biological father who is not even a

party to the adoption)."[31] *Supra* ¶ 25 (footnote omitted) (alteration in original).

¶119 Practically speaking, under the majority's standard, whenever an adoption looms in the background, comment *e* doesn't apply and a child's domicile doesn't change until an adoption is completed—even if a birth mother shows an intent to relinquish her parental rights and gives up custody of the child before the adoption petition's filing. *Supra* ¶ 27 ("[A] mother taking a step toward an adoption that is not yet final cannot amount to an immediate and unconditional intent to relinquish her parental rights and obligations (an abandonment) . . . ."). The majority characterizes "birth mother's surrender of custody and waiver of her parental rights and obligations in the context of a formal adoption" as "certainly evinc[ing] an intent to *eventually* turn over parental rights and obligations to a *specific*, state-vetted adoption agency or couple." *Supra* ¶ 25. But it holds that those actions don't qualify as abandonment because a birth mother doesn't "intend[] to immediately and unconditionally relinquish parental rights and obligations—walk away from or 'abandon' her child—when she chooses to put her child up for formal adoption rather than simply leave him at the doorstep, daycare center, or family friend's home." *Supra* ¶ 25. By so holding, not only does the majority inject new qualifiers into the abandonment standard—"immediately and unconditionally"—it also ignores comment *e*'s directive to examine Birth Mother's "intention" for giving up custody. *See* SECOND RESTATEMENT § 22 cmt. e. Under comment *e*, if Birth Mother gave custody of B.B. to the adoption agency "with the intention of relinquishing [her] parental rights and obligations," she has abandoned the child for purposes of domicile. *Id.* It doesn't matter whether she was *successful* in relinquishing those rights and obligations, as long as she intended to. By signing the relinquishment forms here (which provided that "[b]y signing this document you are giving up your rights as a parent" and that "[y]ou cannot revoke the consent to your child's adoption once you sign this document"), Birth Mother clearly intended to relinquish

_____

[31] I don't advocate that Birth Mother's abandonment relinquished her parental rights to anyone. I'm merely saying that she gave custody of B.B. to another with the intention of relinquishing her parental rights, thereby effecting an abandonment under the Second Restatement, which changed B.B.'s domicile (but left her parental rights fully intact).

her parental rights and obligations[32]—even though she didn't accomplish that goal—and she, to that end, abandoned B.B. for purposes of domicile.

¶120   Besides holding that comment *e* doesn't apply because Birth Mother didn't abandon B.B., the majority makes it very hard for the domicile of a child born out of wedlock to change to that of the birth father, even if the birth mother has abandoned the child: "[T]he domicile of a child born out of wedlock will transfer to the domicile of the biological father only in limited circumstances— such as when he marries the child's biological mother." *Supra* ¶ 26. Under the majority's reading of the Restatement, then, abandonment can never change the domicile of a child born out of wedlock to that of the birth father. *See supra* ¶ 36 (declining to apply comment *e* because the comment "starts from a place from which we know for a fact B.B. did not—a birth *in wedlock*" (emphasis added)). In the majority's view, other than the presence of potential other unnamed "limited circumstances," only marriage between the child's biological parents can do so. *Supra* ¶ 26.

¶121   This interpretation is wrong, given that comment *c*—the comment about the domicile of a child born out of wedlock—points to abandonment under comment *e* as a way for the domicile of a child born out of wedlock to switch from that of the mother to that of someone else. SECOND RESTATEMENT § 22 cmt. c. Comment *e*, in turn, states that a "child domiciled with his mother and abandoned by her takes the domicil of his father if he has not been abandoned by him." *Id.* cmt. e. Read in conjunction with comment *c*, the reference to "father" in comment *e* logically refers to the father of the child born out of wedlock (at least when determining the domicile of a child born out of wedlock).

¶122   As supposed support for its conclusion, the majority relies first on comments *a* and *c* of section 22 of the Second Restatement—which are about the domicile of fathers and children born out of wedlock, respectively—and then on comment *g*, which is about adopted children. *Supra* ¶¶ 25–27. I now examine each of these comments.

¶123   I turn first to comments *a* and *c*. The majority recognizes that there are exceptions to when the domicile of a child born out

_____

[32] This is strong evidence that Birth Mother even intended to "immediately and unconditionally relinquish" her parental rights and obligations, if I were to apply the majority's abandonment standard.

of wedlock follows the domicile of the mother. *Supra* ¶ 26. Indeed, comment *c* announces that "[a]n illegitimate child has the domicil of his mother, except as stated in Comments *e–i*." SECOND RESTATEMENT § 22 cmt. c. Comment *c* also says that "[u]pon a change of domicil by the mother during the child's minority, the child takes the mother's new domicil whether the child lives with the mother or not, except as stated *immediately below* and in Comments *e–i*." *Id.* (emphasis added).

¶124 The majority latches onto the exceptions "stated immediately below" and doesn't let go of them. *Supra* ¶ 26. There are two exceptions listed. First, "[t]he child's domicil will not follow that of a stepfather." SECOND RESTATEMENT § 22 cmt. c. Second, "[a]fter the mother's marriage to a man who is not the child's father, the child's domicil will be that of the mother." *Id.* The majority relies on these exceptions to conclude "that the domicile of a child born out of wedlock will transfer to the domicile of the biological father only in limited circumstances—such as when he marries the child's biological mother." *Supra* ¶ 26. This conclusion, says the majority, is reinforced by comment *a*, which says "that a child born in wedlock 'is assigned the father's domicil.'" *Supra* ¶ 26 (citing SECOND RESTATEMENT § 22 cmt. a).

¶125 This is flatly wrong. Not only does the majority ignore the relevant comment—comment *e*—neither exception in comment *c* "stated immediately below" applies here. No stepfather is involved, and B.B.'s domicile hasn't changed because of a marriage. Although the exceptions imply that children born out of wedlock take their father's domicile upon their father's marriage to their mother, they do not say or imply that the *only way* for children born out of wedlock to take their father's domicile is for their mother to marry him. And, as mentioned above, comment *c*—the comment about the domicile of children born out of wedlock—incorporates abandonment under comment *e*, proving that the domicile of a child born out of wedlock can change as a result of an abandonment. SECOND RESTATEMENT § 22 cmt. c. And comment *e* even tells us *how* the child's domicile can change upon being abandoned by the mother: it switches to that of the father. *Id.* cmt. e.

¶126 Having discussed comments *a* and *c*, I now touch upon comment *g*—the comment about the effect of adoption on a child's domicile. This comment is irrelevant to this case. Comment *g* merely tells us the domicile of an adopted child: an adopted child "takes the domicil of the adoptive parent" but only at the "moment of adoption." SECOND RESTATEMENT § 22 cmt. g. Discussing comment *g*, the majority asserts that the "shift in [the child's]

domicile does not take place until the adoption is final." *Supra* ¶ 27. I agree. But here we aren't concerned about whether B.B. has taken the domicile of adoptive parents; he isn't an adopted child. We care, rather, only about whether B.B. took the domicile of his birth father *before* the adoption petition was filed. *Halloway*, 732 P.2d at 966 ("[T]he propriety of the trial court's assumption of jurisdiction turns on [the Indian child's] domicile at the time these proceedings were initiated."). But comment *g* doesn't help us decide that issue. Under comment *g*, when an adoption is contemplated for a child, that child's domicile doesn't flip *to that of the adoptive parents* until the adoption is final. But comment *g* doesn't say or imply that—before an adoption petition is filed—the child's domicile can't change *to that of the birth father*, even when an adoption is contemplated. It most certainly can. Comments *c* and *e* allow that to happen through abandonment. SECOND RESTATEMENT § 22 cmts. c, e. So, comments *c* and *e*—not comment *g*—are the relevant provisions here.

¶127 In all its discussion, the majority merely glosses over comment *c*'s reference to comment *e*—the comment about abandonment. This, perhaps, is because the majority's interpretation, practically speaking, doesn't apply comment *e*'s provision on abandonment whenever the abandoning parent contemplates a future adoption. *Supra* ¶¶ 25, 27. That cannot be. In defining abandonment, comment *e* uses language about "the intention of relinquishing . . . parental rights and obligations." SECOND RESTATEMENT § 22 cmt. e. That language is a term of art that repeatedly appears in the adoption context.[33] And it makes sense

---

[33] *See, e.g., In re Estate of Hannifin*, 2013 UT 46, ¶ 13, 311 P.3d 1016 (discussing agreements in which "a child's parents agree with the adoptive parents to relinquish all their rights to the child" (citation omitted)); *State ex rel. N.M.*, 2018 UT App 141, ¶ 13, 427 P.3d 1239 (chronicling how a birth mother "advised the court that she wished to relinquish her parental rights to Child to allow Maternal Grandparents to adopt Child"); *State ex rel. E.C.*, 2015 UT App 227, ¶ 4, 359 P.3d 1264 (per curiam) (noting that the mother "relinquish[ed] her parental rights so that the children could be adopted"); *State ex rel. J.C.R.*, 2011 UT App 263, ¶ 3, 259 P.3d 1076 (per curiam) (noting that a father had "confirmed that he wished to voluntarily relinquish his parental rights to his children, and acknowledged that he would have no further rights regarding the children's future care, custody, visitation, or adoption"); *State ex rel.*

(continued . . .)

that adoption-like language appears in a section about abandonment and domicile, given that many courts have recognized that the actions a parent takes while contemplating an adoption can arise to an abandonment, thus changing the child's domicile or otherwise affecting the court's jurisdiction.[34] Comment *e* thus suggests that abandonment applies in the adoption context and that events preceding an adoption petition's

_____

*M.M.*, 2000 UT App 151U, para. 1 (dismissing a challenge to an adoption that alleged that the State "fraudulently misrepresented [the birth mother's] competency to voluntarily relinquish her parental rights and consent to her child's adoption"); *In re Adoption of J.J.*, 1999 UT App 362, ¶ 1, 993 P.2d 257 (per curiam) (noting that a mother "signed a relinquishment of parental rights believing her children would be adopted by . . . relatives"); *In re Adoption of Infant Anonymous*, 760 P.2d 917, 918, 920 (Utah Ct. App. 1988) (holding that a consent to adoption—which stated, "I hereby relinquish all of my parental rights"—was knowing and voluntary).

[34] *See, e.g.*, *Halloway*, 732 P.2d at 967 (recognizing that "the trial court properly could find" that a child's natural mother abandoned him before appearing in court and signing a consent to adoption when she "learned that [her child] was in an adoptive home and that an adoption was contemplated, yet she permitted him to remain there" and holding that "[u]nder traditional rules of law, [the child's] domicile" would've changed at that time); *In re Adoption of M.L.L.*, 810 N.E.2d at 1092 (holding that a birth mother abandoned her child for the purposes of jurisdiction when, before the filing of the adoption petition, she requested that others take the child "to live with them in [another state], signed a consent to guardianship and consent to adopt, and helped them pack [her child's] belongings, including [her child's] birth certificate and social security card"); *In re Guardianship of Brazeal*, 254 P.2d 886, 887 (Cal. Dist. Ct. App. 1953) (holding that birth parents abandoned their child for the purposes of the minor's residence and jurisdiction when they gave custody of their child to another couple shortly after the child's birth with the "express understanding . . . that they should raise the child as their own child and that the child should not be informed as to her true parents" and the birth parents urged the couple to legally adopt the child).

filing can effect a change in the domicile of a child born out of wedlock. That's what happened here.[35]

2. The Majority Confuses Abandonment in the Domicile Context with Abandonment in the Context of Termination of Parental Rights

¶128 Besides misinterpreting the Second Restatement, the majority jumbles abandonment in the domicile context with abandonment in the context of termination of parental rights. It holds that the "district court . . . erred in its determination that [Birth Mother's] relinquishment forms in the formal adoption context constituted an 'abandonment' that resulted in the establishment of a perfected legal relationship between the child and his unwed biological father (and therefore a change in the child's domicile)." *Supra* ¶ 30. Similarly, the majority asserts that to affirm the district court's ruling, it would "have to hold . . . that her parental rights and obligations revert at the filing of the adoption petition to a third party whose parental rights are at best inchoate." *Supra* ¶ 32. From these statements, it appears that the majority believes that if it were to find that Birth Mother abandoned B.B. before the adoption petition's filing, then it would have to hold that her parental rights have been terminated and surrendered to Birth Father. Not so.

¶129 The majority confuses abandonment—as the term is used in the context of terminating parental rights—with abandonment as used in the context of establishing domicile. In cases that involve the termination of parental rights, the term *abandonment* is used in a pejorative sense and typically serves as a proxy for a total abdication of parental responsibilities. *See, e.g., State ex rel. T.E.*, 2011 UT 51, ¶ 20, 266 P.3d 739 ("[A] showing of abandonment requires satisfaction of a two-part test. First, the petitioner must demonstrate that the respondent parent has

---

[35] There are scenarios in which the tribe no longer has exclusive jurisdiction. For example, once Birth Mother moved to Utah, she became a Utah domiciliary. Because B.B. is a child born out of wedlock, he took her domicile (Utah) when he was born. Utah. So, if Birth Mother hadn't abandoned B.B. before the petition's filing, B.B. would've been a Utah domiciliary, giving Utah courts jurisdiction over the adoption petition. But because she did abandon him before the petition's filing, B.B.'s domicile switched from that of Birth Mother (Utah) to that of Birth Father (the Cheyenne River Sioux Reservation), giving the tribal court exclusive jurisdiction.

engaged in conduct that implies a conscious disregard for his or her parental obligations. Second, the petitioner must show that the respondent parent's conduct led to the destruction of the parent-child relationship." (citations omitted)). In those cases, it makes sense that abandonment would carry with it a negative connotation. Indeed, courts should not terminate parental rights—in the absence of a voluntary relinquishment—without first finding by clear and convincing evidence that the parent is no longer deserving of that constitutionally protected right. *See*, *e.g.*, *In re K.S.*, 737 P.2d 170, 172 (Utah 1987) ("The parent-child relationship is constitutionally protected, and termination of that relationship is a drastic measure to be used only when the evidence is clear and convincing that the parent is unable or unwilling to perform the duties and responsibilities of a parent.").

¶130   But no parental rights are being adjudicated here. This appeal is purely about domicile and jurisdiction. Despite the majority's characterization otherwise, we're not deciding the adoption petition on the merits. All that's to be decided today is *which court* gets to adjudicate the parties' parental rights.[36] And so our case law discussing abandonment in the context of terminating parental rights is generally inapposite here.

¶131   A finding of abandonment for purposes of establishing an Indian child's domicile doesn't affect Birth Mother's parental rights. *See supra* ¶ 127 n.33. Indeed, courts often decide whether a child has been abandoned for purposes of jurisdiction, without deciding whether the abandonment terminated the abandoning parent's parental rights. *See supra* ¶ 127 n.33.

¶132   In sum, a finding of abandonment for purposes of domicile is separate from a finding of abandonment for purposes of adjudicating parental rights. While the two determinations may turn on similar—if not identical—sets of facts, a finding of

_____

[36] We have done this before. In *Halloway*, we determined that the tribal court of the Navajo Nation had exclusive jurisdiction over an adoption proceeding and dismissed the adoption petition for lack of jurisdiction. 732 P.2d at 972. After picking up the baton, the Navajo tribal court adjudicated the Indian birth mother's parental rights less than one year later. T.R. Reid, *Mormon-Navajo Adoption Fight Settled*, WASH. POST (Oct. 30, 1987), https://www.washingtonpost.com/archive/politics/1987/10/30/mormon-navajo-adoption-fight-settled/21450d04-6b25-467e-8e92-c5f5ba11ed6e/?noredirect=on&utm_term=.0829663044d1.

abandonment in one context does not compel (or even influence) a finding of abandonment in the other. For that reason, the majority's assertions that our decision today could somehow impact Birth Mother's parental rights under ICWA are misguided.

3. The Majority Misapplies the Standard That I Endorse Today

¶133   Finally, the majority asserts that, to a certain extent, "[i]f the abandonment standard endorsed by . . . the dissent were correct, then the parents in *Holyfield* would have abandoned their children and shifted their children's domicile off the reservation." *Supra* ¶ 51. That conclusion is incorrect for three reasons.

¶134   First, the *Holyfield* parents relinquished custody and their parental rights at the same time. *Holyfield*, 490 U.S. at 37. Thus, even if they abandoned the children, the children's domicile would've still been the Choctaw Reservation because the children's father was domiciled there. *See* SECOND RESTATEMENT § 22 cmt. e ("Except as stated in Comments *f–i*, . . . a child abandoned by *both parents simultaneously* retains the domicil of the father at the time of the abandonment." (emphasis added)); *Id.* cmt. g (explaining that, in the context of adoption, a child doesn't take "the domicil of the adoptive parent" until "the moment of adoption").

¶135   Second, I see nothing in the *Holyfield* opinion that suggests that the parents gave up custody of their children before the adoption petition was filed. *See Holyfield*, 490 U.S. at 37–38. And without a transfer of custody, there would've been no abandonment before filing the petition. *See* SECOND RESTATEMENT § 22 cmt. e (noting that one situation in which an abandonment occurs is "when the parent gives the *custody* of the child to another with the intention of relinquishing his parental rights and obligations." (emphasis added)); *accord Halloway*, 732 P.2d at 966 ("As a general matter, abandonment occurs when a parent . . . *places a child with another* with an intent to relinquish all parental rights and obligations." (emphasis added)).

¶136   Third, under the standard I endorse today, "the doctrine of abandonment cannot be used by Native American Indian parents as part of a scheme to facilitate adoption of their children by non-Indians while they remain domiciliaries of the reservation." *Supra* ¶ 98. For that reason, the parents in *Holyfield*—who were domiciliaries of the Choctaw Reservation—could not have used abandonment to evade the tribal court's jurisdiction. The result of *Holyfield*, therefore, would've been the same under the abandonment standard that I endorse.

## IV. WE LACK JURISDICTION

¶137 Having established that B.B. was domiciled on the Cheyenne River Sioux Reservation when the adoption petition was filed, ICWA prescribes the outcome: the Cheyenne River Sioux tribal court has exclusive jurisdiction over this case. 25 U.S.C. § 1911 ("An Indian tribe *shall have jurisdiction exclusive as to any State* over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe . . . ." (emphasis added)). Thus, no Utah state court has jurisdiction and the case must be dismissed. *See, e.g.*, *Ramsay v. Kane Cty. Human Res. Special Serv. Dist.*, 2014 UT 5, ¶ 17, 322 P.3d 1163.

## CONCLUSION

¶138 Under the uniform federal standard of abandonment for establishing domicile in ICWA cases, Birth Mother abandoned B.B. before the filing of this adoption petition. For that reason, B.B. had taken the domicile of Birth Father and was domiciled on the Cheyenne River Sioux Reservation at the time of filing. Thus, under ICWA, the Cheyenne River Sioux tribal court has exclusive jurisdiction over this case, and this case must be dismissed for lack of subject matter jurisdiction. Because the majority holds otherwise, I respectfully dissent.